The INTERNATIONAL UNION OF THE UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA, LOCAL UNIONS NOS. 141, 229, 681, AND 706, Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 80-2393.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 29, 1981.

Decided April 16, 1982.

Louis Robein, New Orleans, La., for petitioner. Jerry L. Gardner, Jr., New Orleans, La., was on the brief for petitioner.

David A. Fleischer, N. L. R. B., Washington, D. C., with whom Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., was on the brief, for respondent.

Rex H. Reed and Richard J. Clair, Springfield, Va., were on the brief for amicus curiae National Right to Work Legal Defense Foundation, Inc., urging affirmance.

Before J. EDWARD LUMBARD,* Senior Circuit Judge for the Second Circuit, ROBB and MIKVA, Circuit Judges.

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. The International Union of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Local Unions Nos. 141, 229, 681 and 706.

Opinion for the court filed by Senior Circuit Judge LUMBARD.

Dissenting opinion filed by Circuit Judge MIKVA.

LUMBARD, Senior Circuit Judge:

In bargaining for a renewal of labor management contracts in four right-to-work states, the Union[1] insisted on clauses assessing non-union employees for the costs of union representation. International Paper Co. (the Company) responded that, in those states, such clauses were illegal under right-to-work laws. The National Labor Relations Board (NLRB) found that such clauses were not a mandatory subject for bargaining, and therefore insistence on the clauses was an unfair labor practice. 252 NLRB 181, [1980–81] CCH NLRB ¶ 17,596 (1980). The Union petitioned for review and the NLRB cross-petitioned to enforce its order. We grant enforcement of the Board's order.

The facts were found at an administrative hearing, Schlesinger, A.L.J., and are not disputed on appeal. Pipefitters at company plants in Springhill, La., Panama City, Fla., Natchez, Miss., and Camden, Ark. belong to Union Locals in the four states. Costs of union administration are borne by the locals; costs of negotiating a contract traditionally have been split between the locals and the international union. In 1974, Local 681 in Mississippi added a yearly assessment of two percent of wages to the existing union dues of $8.25 per month. Pipefitters at the Natchez, Miss., plant quit the Union rather than pay the assessment. Local 681's membership in Natchez declined from 38 to 1, the last member being the shop steward who by virtue of his position was not required to pay dues.[2] Of course, Local 681 remained obligated to represent the Natchez pipefitters even though none of them paid dues.[3] *Abood v. Detroit Board*

2. The other locals did not have similar problems. Locals 141 and 229 retained all of their members. Only two of 29 pipefitters ' represented by Local 706 refused to pay dues.

3. Judge Schlesinger suggested that the Union could disclaim any interest in representing the Natchez employees. The Board did not consider this point on appeal, and neither party has raised the issue here.

*of Education*, 431 U.S. 209, 221–22, 97 S.Ct. 1782, 1792, 52 L.Ed.2d 261 (1977); *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 760–61, 81 S.Ct. 1784, 1795–96, 6 L.Ed.2d 1141 (1961).

When the Union opened contract negotiations with the Company in May 1977, it proposed clauses levying "representation fees" on non-member pipefitters. The Union's final draft of the clauses was:

The cost and expenses of representing all members of the bargaining unit, without regard to union affiliation or lack of same must be borne by all bargaining unit employees.

Those unit employees who voluntarily choose not to become union members shall be required to contribute a pro-rata share of the costs and expenses incurred by the union that are directly related to enforcing and servicing the collective bargaining agreement. The representation fee will apply only when a collective bargaining agreement is in effect. Furthermore, in no case will the fee exceed the dues and assessments required of union members.

Failure of any *permanent* employee to make payment of the representation fee each month and to maintain the payments during employment for dismissal after ten (10) days written notice to the employee and the company.

The amount of the representation fee will be based upon an independent audit to determine those services performed by the union directly related to the collective bargaining process. . . .

The Union and the Company reached agreement on all other contract provisions, but on September 28, 1977, the Company rejected the representation fee clauses on the grounds that they violated the right-to-work laws of Arkansas, Florida, Mississippi, and Louisiana.[4] On October 17, the Union wrote to the Company to insist on the clauses, and to announce that picketing would commence at Natchez on October 31. The Company then filed its unfair labor practice charge.

At the NLRB hearing, Judge Schlesinger ruled that representation fees were permissible under § 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3), which says:

It shall be an unfair labor practice for an employer . . . (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* That nothing in this Act, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement. . . .

But Judge Schlesinger then concluded that the representation fees were banned by the right-to-work laws of the four states under § 14(b) of the NLRA, 29 U.S.C. § 164(b), which provides:

Nothing in this subchapter shall be construed as authorizing the execution or

4.  Ark.Stat.Ann. § 81–202 provides in part that "No person shall be denied employment because of membership in, or affiliation with, a labor union . . . nor shall any person unless he shall voluntarily consent in writing to do so, be compelled to pay dues, or any other monetary consideration to any labor organization as a prerequisite to, or condition of, or continuance of, employment."

La.Rev.Stat.Ann. § 23:983 provides that "No person shall be required, as a condition of employment, to become or remain a member of any labor organization, or to pay any dues, fees, assessments, or other charges of any kind to a labor organization."

Miss.Const.Art. VII and § 198–A and Miss. Code Ann. § 71–1–47 provide that "No employer shall require any person, as a condition of employment or continuation of employment to pay any dues, fees or other charges of any kind to any labor union or labor organization."

Fla.Const.Art. I § 6 provides that "The right of persons to work shall not be denied or abridged on account of membership or nonmembership in a labor organization." This provision was construed to prohibit an agreement requiring nonunion members to pay their pro-rata share of bargaining and grievance costs, *Florida Education Ass'n v. Pub. Empl. Rel. Com.*, 346 So.2d 551 (Fla.App.1977).

application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial Law.

The Union argued that fee-for-service clauses are the equivalent of "membership in a labor organization" under § 8(a)(3) but not under § 14(b). Such clauses, the Union claimed, are necessary to prevent "free riders" such as the Natchez employees. Judge Schlesinger concluded, however, that by passing § 14(b) Congress had deliberately allowed the States to make their own judgment on the issue of "free riders." He held that the representation fee clauses were prohibited by State law under § 14(b), and the Union committed an unfair labor practice under § 8(a)(3) by bargaining to impasse for the clauses. The Board adopted Judge Schlesinger's opinion that § 14(b) permitted states to ban representation fees and ordered the Union to cease violating § 8(a)(3) by its insistence on the fees; whereupon the Union petitioned for review and the Board cross-petitioned for enforcement.

The legislative history of the Taft Hartley Act of 1947 which enacted § 14(b), clearly supports the Board's ruling. Congress knew precisely what state laws it was validating when it passed § 14(b). *See Air Transport Ass'n of America v. Professional Air Traffic Controllers Organization*, 667 F.2d 316, 321 (2d Cir. 1981). The House report listed each state which had passed a right-to-work law or constitutional provision. H.R.Rep.No.245, 80th Cong., 1st Sess. 34, *reprinted in* I *Legislative History of the Labor Management Relations Act of 1947* 324 (1948). Among the enactments noted was the Arkansas statute at issue in this case. Another was the Georgia statute, Law No. 140 §§ 3–4, 1947 Ga.Laws 616, 618 (March 27, 1947) (codified as Ga.Code §§ 54–903–04 (1978)):

> § 54–903—No individual shall be required as a condition of employment or continuation of employment to pay any fee, assessment or any other sum of money whatsoever to a labor organization.

> § 54–904—Any provision in a contract between an employer and a labor organization which requires as a condition of employment, or continuation of employment, that any individual ... pay any fee, assessment or other sum of money whatsoever to a labor organization, is hereby declared to be contrary to the public policy of this state.

The Mississippi statute at issue here is almost identical to the Georgia statute above, which Congress practically incorporated by reference into the legislative history of § 14(b).

Congress also knew about the free rider problem posed by such laws when it sanctioned such laws by passing § 14(b), as the report of the Senate Committee shows:

> A controversial issue to which the committee has devoted the most mature deliberation has been the problem posed by compulsory union membership.... [A]buses of compulsory membership have become so numerous there has been great public feeling against such arrangements. This has been reflected by the fact that in 12 States such agreements have been made illegal either by legislative act or constitutional amendment, and in 14 other States proposals for abolishing such contracts are now pending. Although these regulatory measures have not received authoritative interpretation by the Supreme Court [citation omitted] it is obvious that they pose important questions of accommodating Federal and State legislation touching labor relations in industries affecting commerce [citations omitted]. In testifying before this committee, however, leaders of organized labor have stressed the fact that in the absence of such provisions many employees sharing the benefits of what unions are able to accomplish by collective bargaining will refuse to pay their share of the cost.

Report of the Senate Committee on Labor and Public Welfare presented by Senator Taft, 80th Cong., 1st Sess. 6, April 17, 1947, *reprinted in* I *Legislative History, supra*, at

412. Senator Taft reported his bill, S. 1126, one week after Representative Hartley introduced H. 3020, whose § 13 was the textual precursor of the Taft-Hartley Act's final § 14(b). Although the original Senate bill did not contain § 14(b), Senator Taft and Representative Hartley were of one mind on federal preemption of state law. On June 5, 1947, Senator Taft explained the future § 14(b) to his peers as follows:

> Many states have enacted laws or adopted constitutional provisions to make all forms of compulsory unionism in such states illegal. As stated in the report accompanying the Senate committee bill, it was not the intent to deprive the States of such power.

Cong.Rec. S 6602, *reprinted in* II *Legislative History, supra,* at 1543. Senator Taft added, "All we have done is to write in expressly what our committee report said." *Id.* at 6604, *reprinted in* II *Legislative History, supra,* at 1546.

Congress knew of the free rider problem; it knew of the state laws at issue here; it passed § 14(b) anyway. President Truman's veto message specifically criticized § 14(b): "The bill's stated policy of preserving some degree of union security would be abdicated in all states where more restrictive policies exist." Cong.Rec. H 7503, *reprinted in* II *Legislative History, supra,* at 920–21.[5]

In short, the legislative history of § 14(b) supports the position of the Board. So does the Supreme Court. On June 3, 1963, the Court held that an "agency shop" agreement, requiring non-members to pay union dues, was the equivalent of membership under § 8(a)(3) and therefore permissible under the NLRA. *NLRB v. General Motors Corp.,* 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963). On the very same day, the Court held that because the agency shop was the equivalent of membership under § 8(a)(3), it was for that reason the equivalent of membership under § 14(b) and therefore amenable to prohibition by state law. *Retail Clerks Int'l Ass'n v. Schermerhorn,* 373 U.S. 746, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963).

The connection between the § 8(a)(3) proviso and § 14(b) is clear. Whether they are perfectly coincident, we need not now decide, but unquestionably they overlap to some extent.... Whatever may be the status of less stringent union-security arrangements, the agency shop is within § 14(b).

*Id.* at 751–52, 83 S.Ct. at 1464–65.[6]

The Union's "representation fee" is a "less stringent union-security arrangement" than the fee in *Schermerhorn* because it is not set to equal union dues. The represen-

---

**5.** The dissent insists that in passing § 14(b) Congress intended state regulation only of closed or union shops. But President Truman's veto message complained that § 14(b) allowed the states to ban all forms of union security, and both friends and foes of the Taft-Hartley Act agreed with that assessment. Senator Murray's analysis of the bill concluded that "Section 14(b) ... expressly provides that in the case where the State law covering union-security agreements is more rigorous than the policy expressed in the bill such State law shall be unaffected." Cong.Rec.S. 6665–66 (June 6, 1947), *reprinted in* II *Legislative History, supra,* at 1586, Senator Pepper said the section "leaves in effect all the strictures which any state may impose." Cong.Rec.S. 6678 (June 6, 1947), *reprinted in* II *Legislative History, supra,* at 1596. Senator Morse specifically objected to § 14(b) "which completely outlaws any form of the union shop in those States that have enacted laws abolishing or making illegal all forms of union security." Cong.Rec.S. 6613 (June 6, 1947), reprinted in II *Legislative History* at

1562. Clearly Congress equated membership with union security and considered the latter subject to state regulation. It is difficult to see how the agreement at issue can not be termed a union security agreement.

**6.** The *General Motors* and *Schermerhorn* cases neatly illustrate the Union's dilemma: the agreement at issue must concern "membership" to be a mandatory subject of bargaining under § 8(a)(3), but must not concern "membership" in order to avoid state regulation under § 14(b). The dissent attempts to avoid this dilemma by stating that the agreement is a mandatory subject of bargaining under § 8(d) as regulating relations between employer and employee or as settling any term or condition of employment. This line of reasoning holds that an agreement concerning employee-union relationships falls under the NLRA provision governing employer-employee relations but not under the NLRA provision governing union security agreements.

tation fee thus escapes *Schermerhorn's* holding, but not its rationale as restated in recent dicta: "Section 14(b) simply mirrors that part of § 8(a)(3) which focuses on post-hiring conditions of employment." *Oil, Chemical & Atomic Workers Int'l Union v. Mobil Oil Corp.*, 426 U.S. 407, 417, 96 S.Ct. 2140, 2145, 48 L.Ed.2d 736 (1976). *See also id.* at 427, 96 S.Ct. at 2150: "To summarize, §§ 8(a)(3) and 14(b) together exhaust the federal interest in the types of union-security agreements employers and unions may make. The closed shop is absolutely prohibited. Any lesser security agreement, though consistent with federal interest is sanctioned only if it harmonizes with state policy." (Stewart, J., dissenting).

The Union argues that not every practice permitted under federal law may be forbidden by the States. The Union cites several circuit court decisions holding that non-discriminatory union hiring halls, permissible under § 8(a)(3), may not be prohibited by right-to-work laws under § 14(b). *Laborers Int'l Union of North America Local 107 v. Kunco, Inc.*, 472 F.2d 456 (8th Cir. 1973); *NLRB v. Tom Joyce Floors, Inc.*, 353 F.2d 768 (9th Cir. 1965); *NLRB v. Houston Chap. Ass'n Gen'l Con.*, 349 F.2d 449 (5th Cir. 1965), *cert. denied*, 382 U.S. 1026, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966). These cases are clearly distinguishable. The regulation of union "membership" permitted to the states under § 14(b) applies only to post-hiring union security arrangements. *Oil, Chemical & Atomic Workers, supra.*[7] Use of a union hiring hall precedes hiring, and therefore does not constitute "membership" under § 14(b). But the representation fees at issue here are clearly a post-hiring union-security arrangement. They fall within the ambit of § 14(b).

Section 14(b) allows states to permit free riders. The Union and the dissent complain that free riders pose more of a burden today than they did when § 14(b) was enacted, but that argument is better addressed to Congress than to this court. A state law valid under § 14(b) in 1947 is valid today, and there is no serious question but that Congress in 1947 intended laws like Mississippi's to survive federal preemption. Moreover, on the facts of this case Mississippi's right-to-work law protects precisely those liberties Congress allowed the states to preserve. The men at the Natchez plant once belonged to the Union. They fled the Union when it raised its tax upon their labor. The dissent argues that the Union can force these men to choose between paying the fees they fled, or losing their jobs— and this notwithstanding state laws to the contrary. This is precisely the "compulsory unionism" Congress had in mind when it passed § 14(b), and this is the core of membership the Supreme Court has interpreted § 14(b) to encompass.[8]

Enforcement granted.

MIKVA, Circuit Judge, dissenting:

The specific question posed by this case is whether employees who are not members of a union can be required to pay their fair share of grievance costs and other collective bargaining expenses incurred by a union on their behalf without thereby becoming "members" of the union, as membership is defined by federal labor law. Congress has never addressed this question, and the Supreme Court has explicitly left it open. The answer given by the majority runs against the grain of federal labor policy and finds no support in the legislative history of the statute from which that answer is said to stem.

---

7. *Oil, Chemical & Atomic Workers Int'l Union v. Mobil Oil Corp.*, 426 U.S. 407, 96 S.Ct. 2140, 48 L.Ed.2d 736 (1976), held that § 14(b) did not permit Texas to ban an agency shop covering seamen. The Court reasoned that Texas law could only govern union-employee relationships where employees worked in Texas, because regulation of union membership permitted by § 14(b) applied to union-employee rela-

tionships on the job, *after* the employee had been hired.

8. If the Union can prove that every cent of union dues and fees is spent on collective bargaining, non-members will then pay exactly the same amount as members, yet the dissent would still hold that such a requirement is not the equivalent of membership.

Stated more generally, the question presented by this case goes to the heart of the model of trade union democracy endorsed by Congress in the Wagner and Taft-Hartley Acts. Under this model, the representative selected by a majority of the employees in a bargaining unit is authorized to bargain with the employer on behalf of the entire unit. "The collective bargaining system as encouraged by Congress and administered by the NLRB of necessity subordinates the interests of an individual employee to the collective interests of all employees in a bargaining unit." *Vaca v. Sipes,* 386 U.S. 171, 182, 87 S.Ct. 903, 912, 17 L.Ed.2d 842 (1967). The subordination of individual interests is not complete, however. Congress has enacted innumerable provisions giving individual employees rights against unions and protecting employees from arbitrary union conduct. One such measure is section 14(b) of the Taft-Hartley Act, 29 U.S.C. § 164(b) (1976), which lets the states outlaw contracts requiring employees to become "members" of the union selected as the bargaining agent. Section 14(b) is thus part of a curious and delicate balance between the powers and duties of unions and the freedom of individual employees.

In recent years, the courts have firmed up one side of this balance by articulating the obligations owed by the exclusive bargaining representative to each employee in the bargaining unit. Decisions such as *Vaca v. Sipes* have made it clear that the union is a necessary party in virtually any relationship between the employer and the employee. Even in right-to-work states, the union cannot refuse to represent individual workers whether or not they are members of the union. The union must press their grievances; it must defend their interests during arbitration and contract negotiation; it must not permit individuals to "opt out" of the contract negotiated for the bargaining unit as a whole.

These duties, and the liabilities for breaching them, have been elaborated by the courts rather than by Congress. It follows that courts must take these pronouncements into consideration when addressing the other side of the balance implicit in trade union democracy. Judicial expansion of union obligations provides strong reason for us to hold section 14(b) to its exact terms, and for being careful to read the statute and Supreme Court decisions interpreting it no more broadly than their language justifies. This is not a call for judicial circumvention of section 14(b), but for an understanding that the statute is only one element in a complex equation. If courts emphasize one side of that equation without a corresponding treatment of the other side, their decisions can only undermine the balance appropriately set by Congress. I respectfully dissent.

## I. THE UNION PREDICAMENT

To appreciate the importance of this case, it is necessary to focus on the bind in which the Union found itself in 1977 after the members of one of its locals stopped paying their dues. Local 681 had represented the pipefitters and helpers at mills of the International Paper Company (the Company) in Vicksburg and Natchez, Mississippi, since 1951. The members of Local 681 voted in 1972 to add "working dues," a fraction of the actual hourly earnings of individual workers, to the dues already being assessed Union members at a flat monthly rate. But in 1974, the Local 681 members at the Natchez mill began refusing to pay both kinds of dues.

By 1976, Union membership at the Natchez mill had declined from 38 to 1, and even the remaining member was not required to pay dues by virtue of his position as shop steward. The Union was not decertified at the Natchez mill until July 1979. In the interim, however, Local 681 expended thousands of dollars representing the employees at the Natchez mill despite the fact that it received nothing in dues or fees from those employees during the same period.

This outlay by the Union reflected its statutory duty to represent all employees in the bargaining unit, whether union or nonunion. *See, e.g., Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 564–65, 96 S.Ct.

1048, 1056, 47 L.Ed.2d 231 (1976); *Humphrey v. Moore*, 375 U.S. 335, 342, 84 S.Ct. 363, 367, 11 L.Ed.2d 370 (1964). This obligation arises from the fact that the union, as the exclusive bargaining representative of all employees, must serve the interests of all employees in the bargaining unit "without hostility or discrimination toward any." *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967). The duty was first recognized by the Supreme Court in *Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), in which a union whose constitution excluded blacks from membership sought a collective bargaining agreement that also would have excluded black firemen from service with the railroad. The duty of fair representation has grown enormously in scope since 1944, however, from avoiding racial discrimination to providing daily representation:

> The bargaining representative's duty . . . does not come to an abrupt end . . . with the making of an agreement between union and employer. Collective bargaining is a continuing process. Among other things, it involves day-to-day adjustments in the contract and other working rules, resolution of new problems not covered by existing agreements, and the protection of employee rights already secured by contract. The bargaining representative can no more unfairly discriminate in carrying out these functions than it can in negotiating a collective agreement.

*Conley v. Gibson*, 355 U.S. 41, 46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *see Abood v. Detroit Board of Education*, 431 U.S. 209, 221–22, 97 S.Ct. 1782, 1792, 52 L.Ed.2d 261 (1977). The National Labor Relations Board (NLRB) has repeatedly held that a union cannot lawfully refuse to process a grievance of an employee in the bargaining unit on the ground that he is not a union member. *E.g., International Brotherhood of Electrical Workers, Local 1504*, 211 NLRB 580 (1974); *Locals 186, 381, 396, et al., affiliates of the International Brother-*

*hood of Teamsters*, 203 NLRB 799 (1973); *United Steelworkers of America, Local 937*, 200 NLRB 40 (1972).

These decisions have compounded the problem of "free riders"—employees who obtain the benefits of union representation while refusing to join the union and thereby support the cost of its activities. Fifty years ago, when the Wagner Act was passed, free riders simply benefitted from accomplishments that the union would have sought in any event, such as higher wages or improved working conditions. Today, free riders can invoke union efforts on their particular behalf, such as the prosecution of nonunion grievances and arbitrations, and thus affirmatively deplete the union's treasury. The difference is like that between the house guest who warms himself beside the fireplace, and the guest who demands that the thermostate be turned up. In short, the problem of free riders has become more pronounced as the responsibilities of unions have grown.

In the interest of "fair representation," however, the NLRB has frustrated union efforts to recoup these costs from free riders. In *Hughes Tool Co.*, 104 NLRB 318 (1953), for example, the Board held that a union could not charge nonunion employees a flat rate for handling their grievances, or a graduated fee for handling arbitrations. In *Machinists Local 697*, 223 NLRB 832 (1976), the Board held that a union could not charge nonunion employees the actual costs of handling their grievances and arbitrations. In both cases the Board reasoned that these charges were unlawful because similar fees were not charged to union members, thereby ignoring the fact that the members had presumably already met the expense of such representation in their dues.

Whatever the wisdom of these NLRB decisions, Local 681 continued to represent the employees at the Natchez mill long after it ceased to have any dues-paying members at that location.[1] Between May 1976 and

---

1. It is not clear whether the Union could have "walked away" from this situation while the collective bargaining agreement was still in force. The NLRB allows filing of petitions for decertification only between the 90th and 60th day prior to the expiration of the contract or

June 1978, the Union's agent travelled to Natchez once a week to handle grievance, insurance, pension, vacation, and other matters and to attend safety meetings. The Union successfully prosecuted 19 grievances, negotiated a new contract after frequent bargaining sessions resulting in wage increases and other added benefits for the Natchez employees, and hired an attorney to represent Local 681 in a Title VII civil rights action. In the fiscal year ending June 30, 1977, Local 681 expended approximately $10,700 in order to represent the employees at the Natchez mill.[2]

It is not surprising that the Union attempted to remedy this erosion of its financial resources by proposing the "representation fee" clause to the company during contract negotiations in May 1977.[3] The clause would have collected from each nonunion employee "a pro rata share of the costs and expenses incurred by the union that are directly related to enforcing and servicing the collective bargaining agreement," as determined by "an independent audit to determine those services performed by the union directly related to the collective bargaining process." The initial representation fee required of the 38 employees at the Natchez mill would have been $5 a week, allowing the Union to collect approximately $9,900 a year or somewhat less than the $10,700 expended by Local 681 in representing those employees. The clause specifically stated that in no event would the representation fee exceed the dues and assessments required of Union members. Had the Natchez employees remained in the Union and paid all their dues and assessments under the pre-existing dues structure, the Union would have collected a total of $14,200—which would have provided approximately $3,500 in additional income that it could have used for institutional expenses.[4]

after the termination of the contract. *See Deluxe Metal Furniture Co.*, 121 NLRB 995, 1000 (1958). Such petitions must be filed by employees or a "labor organization acting in their behalf," 29 C.F.R. § 102.60 (1977), and this has been interpreted as a filing "by unit employees or by an organization *other than* the currently recognized or certified organization representing employees." Krupman & Rasin, *Decertification: Removing the Shroud*, 30 Lab.L.J. 231, 232 (1979) (emphasis added). Research has failed to locate a single precedent in which the certified bargaining representative itself sought decertification. *See* 29 U.S.C. § 159(c)(1)(A) (1976). Indeed, as long as even a single member of the bargaining unit remains a member of the union, the union's obligations under the contract may subject it to liability in the event of a breach. *See* 29 U.S.C. § 158(d) (1976) ("the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract" without complying with such requirements as serving written notice 60 days prior to negotiating termination or modification). Even though the shop steward at the Natchez mill did not pay dues by virtue of his position, he apparently remained a member of the Union until it was decertified in July 1979.

**2.** Brief for Petitioner Union (Union Brief) at 9–11; *see* Initial Decision, 252 NLRB 1299, 1300–02 (1980).

**3.** The Union also proposed that similar clauses apply to employees represented by the Union at three other mills owned by the Company—Camden, Arkansas (Local 706), Panama City, Florida (Local 229), and Springhill, Louisiana (Local 141). These mills did not present the same problem to the Union. The 46 and 37 employees represented by Locals 141 and 229, respectively, continued to maintain their union membership. Only two of the 29 employees represented by Local 706 refused to pay their dues. See 252 NLRB at 1300 n.3.

But for the fact that the Union represents the employees at yet another facility of the Company at Vicksburg, Mississippi, where a similar issue has been raised in collective bargaining negotiations, we would face a serious problem of mootness in this case. Since the contractual negotiations that precipitated this litigation, the Company has sold its mill at Panama City, Florida, and has closed the mill at Springhill, Louisiana. The Union and its locals have been decertified at the two mills in Camden, Arkansas, and Natchez, Mississippi. The Union and the Company have preserved the demand for a "representation fee" in the Vicksburg negotiations pending the outcome of this case, however, and both the NLRB and the Union agree that this case is not moot. Brief for Respondent NLRB (NLRB Brief) at 7 n.5; Union Brief at 13.

**4.** This figure is based on a dues structure for Local 681 of $8.25 per month plus the two percent working dues. See 252 NLRB at 1300. Other locals had widely varying dues structures, and it should be noted that the representation fees sought by Locals 141 and 706 would have been equal to the amount of dues paid by their members, and thus unlawful. *Retail*

## II. THE LEGAL ISSUE

There is no doubt that the proposed representation fee violates the Mississippi right-to-work laws,[5] which state:

No employer shall require any person, as a condition of employment or continuation of employment, to pay any dues, fees or other charges of any kind to any labor union or labor organization.

Miss.Const. Art. VII, § 198–A; Miss.Code Ann. § 71–1–47. This observation precipitates but does not resolve the court's inquiry, of course. State law generally cannot be applied to limit the arrangements that unions and employers may make concerning subjects of collective bargaining made mandatory by the National Labor Relations Act, and the administrative law judge specifically found that the representation fee proposed by the Union was such a mandatory subject of bargaining under sections 8(a)(3) and 8(d) of the Act, 29 U.S.C. §§ 158(a)(3), (d). Initial Decision, 252 NLRB 1299, 1303 (1980).

In section 14(b) of the Act, however, Congress authorized the states to enact statutes in conflict with this federal law. Section 14(b) provides:

Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.

29 U.S.C. § 164(b). In other words, when state laws that fall within the scope of section 14(b) conflict with provisions of federal law, state law governs. But the extent to which section 14(b) authorizes states to limit collective bargaining, an area in which Congress has otherwise preempted the field,

is clearly a federal question. *Oil, Chemical & Atomic Workers v. Mobil Oil Corp.*, 426 U.S. 407, 417, 96 S.Ct. 2140, 2145, 48 L.Ed.2d 736 (1976); *NLRB v. Tom Joyce Floors, Inc.*, 353 F.2d 768, 770–71 (9th Cir. 1965). We must therefore determine whether the Mississippi laws banning payment of "charges of any kind" constitute a prohibition of "membership" that is within the scope of section 14(b).

The Supreme Court has carefully left open the precise definition of what it means to require "membership" in a labor organization, as that term is used in section 14(b). In companion cases decided in 1963, the Court did hold that the term "membership" could be "whittled down to its financial core." At issue was the legality of the "agency shop" arrangement, which leaves union membership optional but requires nonunion employees to pay to the union sums equal to the initiation fees and dues of union members. In *NLRB v. General Motors Corp.*, 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963), the Court observed:

It is permissible to condition employment upon membership, but membership, insofar as it has significance to employment rights, may in turn be conditioned only upon payment of fees and dues. "Membership" as a condition of employment is whittled down to its financial core.

*Id.* at 742, 83 S.Ct. at 1459. As a result, the Court said, the "agency shop" is the practical equivalent of the "union shop," an arrangement under which all employees must join the union within a specified period of time as a condition of continued employment. Unions were therefore permitted to bargain for an agency shop in any state in which they could bargain for a union shop, *NLRB v. General Motors Corp.*, but could not bargain for an agency shop in any state where the right-to-work laws prohibited

---

*Clerks v. Schermerhorn*, 373 U.S. 746, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963). The administrative law judge noted this problem, but explained that "the complaint places at issue only the validity of the last of Respondent's proposals [concerning Local 681 in Natchez], and does not rely on the bargaining history; and I limit this Decision to that issue." Initial Decision, 252 NLRB at 1304 n.12.

5. The same conclusion holds for the right-to-work laws of the other three states involved in the negotiations. *See* 252 NLRB at 1302 n.6 (right-to-work laws of Arkansas, Louisiana, and Florida).

bargaining for a union shop. *Retail Clerks v. Schermerhorn*, 373 U.S. 746, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963).

*Schermerhorn*, however, clearly left open the status of the kind of representation fee at issue in this case. Originally, the petitioners in *Schermerhorn* had likened their proposal to the agency shop involved in *General Motors*. Upon briefing and argument, however, the petitioners made a last-minute effort to distinguish their contract from an agency shop. 373 U.S. at 752 n.4, 83 S.Ct. at 1465 n.4. The clause provided that nonunion employees would contribute to the union "for the purpose of aiding the Union in defraying costs in connection with its legal obligations and responsibilities as the exclusive bargaining agent of the employees in the appropriate bargaining unit." The petitioners claimed that this confined nonunion payments "to collective bargaining purposes alone," and prohibited the union from using the payments "for institutional purposes unrelated to its exclusive agency functions." *Id.* at 752, 83 S.Ct. at 1465.

The Supreme Court was "wholly unpersuaded" by this "belated" attempt to distinguish *General Motors*. Justice White's opinion gave two primary reasons. First, contrary to the petitioners' suggestion, the clause at issue imposed "no ironclad restriction" on what the union could do with the payments it received from nonmembers, and therefore could have allowed the union to use these payments for "institutional items." *Id.* at 753, 83 S.Ct. at 1465.[6] Second, because the proposed "service fee" was set *equal* to the union's initiation fees and dues, and because the union dues could be expended for a variety of purposes, there was no guarantee that a nonmember might not pay *more* of the union's collective bargaining costs "than his pro rata share." *Id.* at 754, 83 S.Ct. at 1466. The Court explained:

If the union's total budget is divided between collective bargaining and institutional expenses and if nonmember payments, equal to those of a member, go entirely for collective bargaining costs, the nonmember will pay more of these expenses than his pro rata share. The member will pay less and to that extent a portion of his fees and dues is available to pay institutional expenses. The union's budget is balanced. By paying a larger share of collective bargaining costs the nonmember subsidizes the union's institutional activities.

*Id.* Accordingly, there was no reason why the clause should, "in the present posture of the case, be construed against respondent to raise a substantial difference between this and the *General Motors* case." *Id.* at 752, 83 S.Ct. at 1465. It would be anomalous, the Court said, to let Florida ban agency shop agreements under which union members and nonmembers paid equal shares while forbidding Florida to ban an arrangement in which nonmembers might pay even more bargaining costs than members. *Id.* at 754, 83 S.Ct. at 1465.

By discussing the *Schermerhorn* petitioners' position, clearly only a product of appellate strategy, in so much detail, the Court signalled that it considered the status of the kind of representation-fee proposal now before us to be a difficult question. The Court's discussion draws a clear distinction between agency shops and the collection of fees to cover representation costs. *Schermerhorn* does not govern this case, because the belated effort to distinguish *General Motors* failed. If the representation fee proposed by the Union in this case meets the two conditions laid down in *Schermerhorn* —"an ironclad restriction" against using nonmember payments for

---

6. The Court elaborated on these "institutional items" by quoting from the union's brief:

> Rather typically, unions use their members' dues to promote legislation which they regard as desirable and to defeat legislation which they regard as undesirable, to publish newspapers and magazines, to promote free labor institutions in other nations, to finance low cost housing, to aid victims of natural disaster, to support charities, to finance litigation, to provide scholarships, and to do those things which the members authorize the union to do in their interest and on their behalf.

373 U.S. at 753 n.6, 83 S.Ct. at 1465 n.6.

purposes other than servicing the collective bargaining agreement, with nonunion members paying no more than their pro rata share of such expenses—then the clause conceivably does not require "membership in a labor organization" and therefore is beyond the reach of state right-to-work laws whose application depends on section 14(b).

The NLRB, which affirmed the decision of the administrative law judge in a simple one-page decision and order, 252 NLRB 1299 (1980), seems not to have devoted the careful attention to this case that *Schermerhorn* requires. Nothing in subsequent Supreme Court decisions has departed from its dicta in *Schermerhorn*.[7] The question before us is open, and is a matter of some significance. Our answer must center on the congressional intent in enacting section 14(b). The legislative history is lengthy, often dry, and relatively inconclusive, but it casts serious doubts on the reasoning of the majority.

### III. THE LEGISLATIVE HISTORY OF SECTION 14(b)

A fundamental tension in labor law, as indeed in constitutional law, exists between encouraging majority rule and protecting the rights of the minority. Congress faced this problem many times when it enacted the historic Wagner Act and amended it with the Taft-Hartley Act, and the genesis and scope of section 14(b) must be understood in light of this tension.

The Wagner Act, passed in 1935 during an explosive period in our social history, gave workers the right to organize unions and to bargain collectively with their em-

ployers.[8] The legislation was a factor in the doubling of union membership between 1933 and 1937, a period coinciding with the rise of the great industrial unions. It was also followed by dramatic and often violent strikes. World War II brought a momentary hiatus in industrial strife, but at its conclusion "the no-strike era came to an end, and in 1947 the country experienced the largest strike wave in its history." Stone, *The Post-War Paradigm in American Labor Law*, 90 Yale L.J. 1509, 1523 (1981). Anti-union sentiment was widespread, and representatives on both sides of the aisle agreed that legislative reforms were required.

Congress could conceivably have pulled back from the labor issue entirely and returned the question to the hands of the states. Instead, the Taft-Hartley Act of 1947 concentrated on amending the structure of the NLRB and revising methods for resolving representation disputes. Section 14(b) was not the most substantive change amidst these reforms. It did not enact a new policy, but simply made explicit a congressional understanding that had accompanied passage of the earlier Wagner Act concerning the general tension between rule by union majority and the rights of nonunion minorities.

A full discussion of section 14(b) must therefore begin with the broader problem, and the evolution in congressional attitudes toward the rights of the nonunion minority in a given bargaining unit. At the outset, it may help to define some of the terms that frequently arose in this context. An open shop allows the employer to hire with-

---

7. In *Oil, Chemical & Atomic Workers Int'l Union v. Mobil Oil Corp.*, 426 U.S. 407, 96 S.Ct. 2140, 48 L.Ed.2d 736 (1976), the Court held that the Texas right-to-work law could not be enforced "with regard to an employment relationship whose principal job situs" was not in Texas, even though the employees were hired in Texas and had "a number of other contacts" with the state. *Id.* at 418, 410, 96 S.Ct. at 2146, 2142. In dicta, the Court explained that "Section 14(b) simply mirrors that part of § 8(a)(3) which focuses on post-hiring conditions of employment." *Id.* at 417, 96 S.Ct. at 2145. *Compare id. with Retail Clerks v. Schermerhorn,*

373 U.S. at 751, 83 S.Ct. at 1464: "The connection between the § 8(a)(3) proviso and § 14(b) is clear. Whether they are perfectly coincident, we need not now decide, but unquestionably they overlap to some extent."

8. Prior to passage of the Act, courts had resisted permitting unions to bring suit to enforce collective bargaining agreements because unions were unincorporated associations. *See, e.g., A. R. Barnes & Co. v. Berry*, 169 F. 225, 228 (6th Cir. 1909); *see generally* Sturges, *Unincorporated Associations as Parties to Actions*, 33 Yale L.J. 383, 396–99 (1924).

out regard to union membership, and lets employees obtain or refuse membership in the union as they please. A closed shop requires the employer to hire union members only. A union shop allows the employer to hire without regard to union membership, but requires employees to become members of the union within a specified time after they have been hired. Preferential hiring requires the employer to give a preference to union members, although nonunion employees may be hired if union members are unavailable. Finally, maintenance-of-membership agreements let employees obtain or refuse membership in the union as they please, but require that employees who become union members maintain their membership for the duration of the agreement. The closed shop and the union shop played particularly important roles in shaping the congressional views about minority rights under a model of trade union democracy.

### A. *The Closed Shop*

The Wagner Act, with its emphasis on collective bargaining, treated minority rights almost as an afterthought. Section 9(a) provided:

> Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment, *Provided*, That any individual employee or group of employees shall have the right at any time to present grievances to their employer.

Ch. 372, § 9(a), 49 Stat. 453 (1935) (codified at 29 U.S.C. § 159(a)). Section 8(3) outlawed attempts by employers to force workers into company unions or discourage them from forming their own, but distinguished these practices from union bargaining with employers over means to control the problem of free riders:

> It shall be an unfair labor practice for an employer by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization, *Provided*, That nothing in this act ... shall preclude an employer from making an agreement with a [qualifying] labor organization ... to require as a condition of employment membership therein....

Ch. 372, § 8(3), 49 Stat. 452 (1935) (codified at 29 U.S.C. § 158(a)).

Several Senators criticized the Act for ignoring the rights of employee minorities. *See, e.g.,* 79 Cong.Rec. 7671 (1935) (Senator Tydings) ("As I see this particular section [§ 9(a)], it looks to me like an effort to force every man in America to join a certain kind of union, whether or not he wishes to join that union"); *id.* (Senator Hastings) ("Is it not true that the individual worker should be free to decline association with his fellows? Can that be true under this bill?"). Senator Wagner responded:

> The Senator is concerned with what happens to the minority. Under this proposed legislation ... there will be no advantage which a majority can have under an agreement to which the minority is not also entitled, and in order to have that advantage the minority need not join any organization. It can join or not join, either way. It cannot be discriminated against under any other provision of the law.

*Id.* at 7673. But Senator Hastings was unconvinced. He turned from section 9(a) to section 8(3), and reiterated the charge that the bill would require all workers to join a union regardless of their wishes. Senator Wagner again responded:

> No, Mr. President; the Senator apparently does not understand that provision. It does no more than to legalize a closed-shop agreement, which is a matter of agreement between employer and employee where it is now sustained by the public opinion of the State.... The provision will not change the status quo. That is the law today; and wherever it is

the law today that a closed-shop agreement can be made, it will continue to be the law. By this bill we do not change that situation. Closed-shop agreements are made all over the country, and they are matters of agreement. The question of compulsion is not involved in them. *Id.* at 7673–74.

But Senator Wagner turned out to be wrong. Closed-shop agreements, which prohibited hiring any employee who was not already a union member, did involve compulsion. Between 1935 and 1947, the closed shop became notorious. Union leaders, with unreviewable authority to admit new union members and expel old ones, acted in a corrupt and undemocratic fashion to perpetuate their power. Articles in the popular press and legal journals condemned closed shops and the control they gave unions over the careers of workers. *See, e.g.,* Newman, *The Closed Union and the Right to Work,* 43 Colum.L.Rev. 42 (1943) (arguing that unions operating under closed shops used restrictive admissions requirements to create labor monopoly, perpetuate union management, and protect social prejudices). The Senate Report accompanying the Taft-Hartley Act found:

Until the beginning of the war only a relatively small minority of employees (less than 20 percent) were affected by contracts containing any compulsory features. According to the Secretary of Labor, however, within the last 5 years over 75 percent now contain some form of compulsion. But with this trend, abuses of compulsory membership have become so numerous there has been great public feeling against such arrangements.

It continued with specific examples:

In the maritime industry and to a large extent in the construction industry union hiring halls now provide the only method of securing employment. . . . Extension of this principle to licensed deck and engine officers has created the greatest problems in connection with the safety of American vessels at sea.

Numerous examples were presented to the committee of the way union leaders have used closed-shop devices as a method of depriving employees of their jobs, and in some cases a means of securing a livelihood in their trade or calling, for purely capricious reasons. In one instance a union member was subpenaed to appear in court, having witnessed an assault upon his foreman by a fellow employee. Because he told the truth upon the witness stand, the union leadership brought about his expulsion with a consequent loss of his job since his employer was subject to a closed-shop contract.

Numerous examples of equally glaring disregard for the rights of minority members of unions are contained in the exhibits received in evidence by the committee.

S.Rep.No. 105, 80th Cong., 1st Sess. 6–7 (1947), I Legislative History of the Labor Management Relations Act 412–13 (1948) (hereinafter Leg. Hist.).

Animosity toward the closed shop was widespread in Congress. *See, e.g.,* 93 Cong. Rec. 3453 (1947) (remarks of Representative Holifield); *id.* at A1223 (extension of remarks by Representative Landis). Representative Jonkman observed that "the principle criticism of unions today is not directed at unionism itself but to the irresponsible and corrupt management and leadership into which many unions have drifted. It requires but little reading of the hearings on this bill to cause one to shudder at the tyranny and depredation committed by such union officers and leaders." *Id.* at 3560. Accordingly, Congress added section 8(a)(3) in the Taft-Hartley Act banning the closed shop. Ch. 120, tit. 1, § 8(a)(3), 61 Stat. 140 (1947) (codified at 29 U.S.C. § 158(a)(3)). That section continued:

no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the

periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership.

*Id.*, 61 Stat. at 141.

## B. *Union Shops and Union Security*

It is absolutely crucial to distinguish congressional revulsion toward the closed shop from the congressional treatment of other union security agreements. Congress abolished the closed shop, but it retained lesser forms of union security as subjects of mandatory bargaining under federal law. The closed shop and section 14(b) were thus viewed in different contexts because they focused on different forms of union security agreements.

The majority opinion obfuscates this distinction. The Senate Report that it quotes on page seven, which is said to demonstrate that Congress enacted section 14(b) in order to let the states make their own judgments on the issue of free riders, is not a discussion of section 14(b) at all. The Senate Report only addressed the decision to ban the closed shop, as demonstrated by the paragraphs immediately following the paragraph quoted by the majority:

> The committee has taken into consideration these arguments in reaching what it considers a solution of the problem which does justice to both points of view. We have felt that on the record before us the abuses of the system have become too serious and numerous to justify permitting present law to remain unchanged. It is clear that the closed shop which requires preexisting union membership as a condition of obtaining employment creates too great a barrier to free employment to be tolerated.... This not only permits unions holding such monopolies over jobs to exact excessive fees but it deprives management of any real choice of the men it hires.... If trade-unions were purely fraternal or social organizations, such instances would not be a matter of congressional concern, but since membership in such organizations in many trades or callings is essential to earning a living, Congress cannot ignore the existence of such power.

S.Rep.No. 105, 80th Cong., 1st Sess. 6–7 (1947), Leg.Hist. at 412–13. The Senate Report could not possibly have discussed section 14(b) in any event, because that section originated in the House, was not part of the Senate bill, and was adopted by the Senate only after conference.

It is true that several members of Congress saw no real difference between the closed shop and the union shop, and urged that both be abolished. Representative Fisher declared that "[t]he union shop and the closed shop are Siamese twins. In either case a man cannot work unless he belongs to the union, whether he wants to belong or not." 93 Cong.Rec. 3555 (1947). He observed that "the right to work is one of the most sacred rights a man has," and called the union shop "a form of involuntary servitude." *Id.* Representative Hoffman also urged that

> a man should have the right to join or not to join, to be bound by or not to be bound by, union rules. If this Congress wants to forsake the American principle that the man who must live by toil, who must work if he would eat, have clothing, a home, and be able to provide for his family—if this Congress wants to turn its back upon that principle and say that no man shall work when the employer and the bare majority of the employees say he cannot work unless he conforms to their rules and restrictions—it has the power to do so.

*Id.* at 3554. Representative Abernathy condemned a system that would have workers "paying tribute to someone else" in order to work. *Id.* at 3555. Representative Jonkman said:

> I have, I dare say, thousands of labor constituents in my district who cannot conscientiously become members of certain unions because they cannot and dare not accept joint responsibility for the conduct of leaders of such type. They should not be compelled by the union-shop provision in this bill to accept that stigma but have the right to refrain from joining any union whose leaders engage in disreputable practices.

It is, of course, true that all legislation is the result of compromise. But to compromise on this principle is as I said at the outset a further frittering away of a fundamental American freedom.

*Id.* at 3560.

These criticisms were unavailing, of course. Congress added provisions making it more difficult for workers to obtain a union shop,[9] but it retained the union shop as a mandatory subject of bargaining in section 8(a). Several members emphasized that this policy was required by simple equity. *See, e.g.,* 93 Cong.Rec. 3546–47 (remarks of Representative Celler); *id.* at 3558 (remarks of Representative Robsion). It is significant, however, that when Representative Hoffman offered an amendment designed to make it clear that a worker could not be "denied employment unless he joins," he was persuaded to withdraw that amendment after Representative Barden called his attention to section 14(b). *Id.* at 3561–62.

### C. *Section 14(b)*

Section 14(b) was not a controversial aspect of the Taft-Hartley Act because Congress considered it merely to restate the law under the Wagner Act. The Senate Report to the 1935 Wagner Act had explained that "the bill does nothing to facilitate closed-shop agreements or to make them legal in any State where they may be illegal." S.Rep.No.573, 74th Cong., 1st Sess. 11 (1935); *see* H.R.Rep.No.1147, 74th Cong., 1st Sess. 19–20 (1935). By enacting section 14(b) in 1947, Congress reiterated the point that it had not been the intention of the earlier Congress "to override State laws regulating the closed shop." S.Rep.No.105, 80th Cong., 1st Sess. 6 (1947), Leg.Hist. at 412; *see* H.R.Rep.No.245, 80th Cong., 1st Sess. 44 (1947), Leg.Hist. at 335.

It was never the intention of the National Labor Relations Act, as is disclosed by the legislative history of that act, to preempt the field in this regard so as to deprive the States of their powers to prevent compulsory unionism. Neither the

so-called "closed shop" proviso in section 8(3) of the existing act nor the union shop and maintenance of membership proviso in section 8(a)(3) of the conference agreement could be said to authorize arrangements of this sort in States where such arrangements were contrary to the State policy. To make certain that there should be no question about this, section 13 was included in the House bill. The conference agreement, in section 14(b), contains a provision having the same effect.

H.R.Conf.Rep.No. 510, 80th Cong., 1st Sess. 60 (1947), Leg.Hist. at 564.

It may be inferred, of course, that the decision to spell out the existing law in the Taft-Hartley Act was prompted by the same reaction against union abuses that had led Congress to ban the closed shop. The legality of the union shop had been preserved over the vehement objections of many opponents, but only after Congress took steps to correct the abuses of the union shop as well. The House Report was careful to explain these limitations in detail:

The bill bans the closed shop. Under carefully drawn regulations it permits an employer and a union voluntarily to enter into an agreement requiring employees to become and remain members of the union a month or more after the employer hires them or after the agreement is signed. Such agreements are lawful, however, only if the employees by secret ballot have selected the union as their bargaining agent, and if the majority of all the employees, by a separate secret ballot, authorize the union to enter into the agreement, *and if agreement is not prohibited by State law.* An employee may be expelled from the union and thus forced to leave his job only if the expulsion is by reason of his failing to pay fees and dues imposed upon employees generally. Under this clause, employers may select their own employees. Employees have 30 days to decide whether or not to join the union. Unions may not cause the

---

**9.** *See* text at note 10 & n.10 *infra.*

discharge of employees by discriminating against them. The agreement must be voluntary. Unions may not strike to compel employers to enter into such agreements. They are subject to loss of bargaining rights if they do.

H.R.Rep.No.245, 80th Cong., 1st Sess. 9 (1947), Leg.Hist. at 300 (emphasis added). Clearly, the predominant if not the only purpose of section 14(b) was to provide yet one more check on the abuses that could exist under "compulsory unionism."[10]

The crucial point to be drawn from the legislative history of section 14(b), however, is that Congress never specifically defined what it meant by "compulsory unionism." The paragraph from the House Report quoted above is the entire passage of a section headed "compulsory unionism." The Conference Report stated that section 14(b) would prevent "any closed shop, union shop, maintenance of membership, or other form of compulsory unionism agreement in any State where the execution of such agreement would be contrary to State law. Many States have enacted laws or adopted constitutional provisions to make all forms of compulsory unionism in those States illegal." H.R.Conf.Rep.No.510, 80th Cong., 1st Sess. 60 (1947), Leg.Hist. at 564. But this too leaves the content of the term undefined.

The best evidence of the congressional intent may therefore lie in the kinds of "compulsory unionism" that members of Congress understood had been banned by the state right-to-work laws. Representative Holifield, a defender of closed shops as well as union shops and maintenance-of-membership agreements, noted that

of the 77 percent of all employees in unions [that worked] under some form of union security, 30 percent were under closed-shop contracts, 15 percent under union-shop contracts, 29 percent under maintenance-of-membership contracts, and 3 percent under preferential-hiring contracts—another form of union security provision.

93 Cong.Rec. 3453. He observed:

Under existing law all of these types of shops are legal excepting in some few States in which hysterical legislatures, reckless of constitutional consequences, have banned the closed shop.

*Id.* Representative Barden contended that

in view of the fact that many of the States have passed laws dealing with the closed shop, why, then, the committee felt, and I am sure the whole House will feel, that the States should be recognized and their laws should certainly be given full power and effect as far as a State is concerned.

*Id.* at 3562. Representative Case of South Dakota urged adoption of section 14(b) because

it strengthens the provisions of the bill so far as bans on the closed shop are concerned in the States which have taken action. I think now that there are about 12 States that have taken formal action and another dozen that have that kind of action under consideration.

---

**10.** Critics of the Taft-Hartley Act focused less on section 14(b) than on the other provisions intended to make it more difficult for unions to obtain a union shop. *See, e.g.,* 93 Cong.Rec. 3554 (1947) (remarks of Representative Kennedy) (objecting to provision forbidding strikes for the purpose of obtaining union shop); *id.* at 3454 (remarks of Representative Holifield) (objecting to requirement that union shop clauses be approved by majority vote of the entire bargaining unit, rather than a majority of those voting on the question); *id.* at 6532 (remarks of Senator Barkley) (objecting to same provision). The statement of Minority Views attached to the House Report said little about section 14(b), but bitterly condemned a provision in the Act

that union shop employees could not be denied employment if they offered to pay the required dues and initiation fees:

This, in effect, means that the union is shorn of its power to discipline its own members for good cause. A spy, a stool pigeon, an antiunionist, any individual whose sole purpose is to destroy the union or bring it into disrepute by slander, defamation, or undisciplined action, can continue his activities with impunity.... [The provision] deprives the union's disciplinary action of any element of sanction or of deterrent effect.

H.R.Rep.No. 245, Minority Report, 80th Cong., 1st Sess. 80–81 (1947), Leg.Hist. at 371–72.

*Id.* at 3559. Similarly, in the Senate, the emphasis was on state laws prohibiting the closed shop. Senator Taft defended the section 8(3) proviso, noting that it "did not in any way prohibit the enforcement of State laws which already prohibited closed shops." *Id.* at 6520. His summary of the bill explained that section 14(b) would allow states to prevent "compulsory union membership agreements" where such agreements violated state laws against "compulsory unionism." *Id.* at 6445. Senator Barkley denounced the bill because union shops would be prohibited "in any State where a legislature has passed what we call a non-union or closed-shop bill," *id.* at 6532, and Senator Morse objected to the "antilabor bias" of the bill:

> Thus, we lay down in the bill a very full and complete national policy as to closed- and union-shop agreements. At the same time, the bill provides in section [14(b)], however, that the national policy may be entirely disregarded and superseded by the States if they desire to impose a more restrictive policy *on the same subject matter.*

*Id.* at 6456 (emphasis added). At no time, in the committee reports or during the debates, was it intimated that "compulsory unionism" meant anything more than the closed shop, union shop, and conceivably contracts requiring maintenance of membership or preferential hiring of union members.[11]

One final observation, if an obvious one, should be made about the legislative history of section 14(b). The debates make it clear that Congress knew that several states had banned the closed and union shop, but the legislative history does not suggest that Congress knew these laws sometimes prohibited payment of "any dues, fees or charges of any kind to any labor union" as well. Congress emphatically did not intend

to give the states a free hand in amending federal labor law. Representative Kearney suggested, and Representative Hoffman moved, that section 14(b) be amended by inserting a period and striking out the rest of the section, to read:

> Nothing in this act shall be construed to invalidate any State law or constitutional provision.

93 Cong.Rec. 3559, 3562. The objections to this amendment were obvious. As Representative Case of South Dakota stated:

> Of course, if you put a period there, it would be pretty broad because it would deal with subjects other than the right of the employer to make closed-shop agreements. You might nullify much of the bill, because you would establish State rights to deal with all phases of industrial relations in spite of any provisions whatsoever in the act.

*Id.* at 3559. The amendment was withdrawn.

Had Congress chosen, it could have framed section 14(b) in terms identical to existing state right-to-work laws. Employers could have been precluded from making agreements "requiring membership in or payments of any kind to a labor organization," rather than those simply "requiring membership in a labor organization." On its face, section 14(b) is by no means as broad as the more restrictive state laws that the majority opinion now suggests it incorporated. Congressional attention focused on closed shops and union shops, which were said to place workers at the mercy of capricious or corrupt treatment by labor organizations. Section 14(b) was meant to extend associational freedom to employees in states that had passed legislation dealing with this subject. But the Taft-Hartley Act did not adopt the philosophy that labor unions should be destroyed. Nothing in the legislative history of section

---

11. To the extent that other contemporaneous sources are helpful, it is worth examining the NLRB's Legislative History of the Labor Management Relations Act (1948), published one year after passage of the Taft-Hartley Act and used by the Supreme Court as an authoritative guide. *See, e.g., Oil, Chemical, & Atomic*

*Workers Int'l Union v. Mobil Oil Corp.,* 426 U.S. at 416, 96 S.Ct. at 2144; *NLRB v. General Motors,* 373 U.S. at 741, 83 S.Ct. at 1458. The "sectional index" to this history simply expresses the topic of section 14(b) as "State *Union-Shop* Laws." Leg.Hist. at xxiv (emphasis added).

14(b) suggests that Congress meant to give this power to the states.

## IV. SECTION 14(b) DOES NOT PERMIT STATES TO BAN VALID REPRESENTATION FEES

It cannot be shown that the legislative history of the Taft-Hartley Act and section 14(b) supports the NLRB's ruling in this case. *See* majority opinion at 1260–1261. The legislative history demonstrates only that Congress recognized the tension between union majorities and the rights of non-union minorities, and that in the interest of associational freedom it allowed the states to ban contracts making employment contingent on the "stigma" of joining an organization with which the worker could not "conscientiously" agree. *See* 93 Cong.Rec. 3560 (1947) (remarks of Representative Jonkman). Debate was framed in terms of "compulsory unionism," "paying tribute," and "involuntary servitude," thus taking on ideological proportions. But section 14(b) fully met congressional concerns by referring to compulsory "membership."

### A. *The Meaning of "Membership"*

The wheel has come full circle, and the question still remains the meaning of this term. Plain meaning has its limitations, but it must count for something. "To ascertain what Congress meant . . . we would do well to begin [with] what Congress said." *Shapiro v. United States*, 335 U.S. 1, 39, 68 S.Ct. 1375, 1395, 92 L.Ed. 1787 (1948) (Frankfurter, J., dissenting). There is no suggestion whatsoever in the legislative history that a worker who pays a fee for services rendered by the union thereby becomes a "member" of the union. In any other context, such a proposition would be facially absurd. A commuter can be required to pay a toll for crossing a bridge owned by a corporation without therein becoming a "member" of that corporation. An action for *quantum meruit* by a contractor does not make the defendant a "member" of the contracting firm.

The majority's interpretation is particularly egregious because it ignores the emphasis on "compulsory unionism" that sur-faced again and again in Congress. Nonunion employees working under a representation-fee contract would not in any way be required to support the union, or fund its institutional, union-oriented activities. They would not sign membership cards or be carried on the union's rolls. *See NLRB v. Delaware-New Jersey Ferry Co.*, 128 F.2d 130, 134 (3d Cir. 1942). They would not be required to embrace participation in union activities and maintain "good standing." *See Plumbers' Union v. Borden*, 373 U.S. 690, 695, 83 S.Ct. 1423, 1426, 10 L.Ed.2d 638 (1963); *Radio Officers v. NLRB*, 347 U.S. 17, 39–42, 74 S.Ct. 323, 335–36, 98 L.Ed. 455 (1954). They would not fill out applications, take oaths, or attend meetings. *See Union Starch and Refining Co. v. NLRB*, 186 F.2d 1008, 1011 (7th Cir. 1951). They would not be subject to union-imposed disciplinary measures enforceable in state courts. *See United Stanford Employees, Local 680 v. NLRB*, 601 F.2d 980, 981 (9th Cir. 1979); *NLRB v. Hershey Foods Corp.*, 513 F.2d 1083, 1085 (9th Cir. 1975). They would not have "fulfilled the requirements for membership in such organization." 29 U.S.C. § 402(*o*) (Supp. III 1979) (Landrum-Griffin Act definition of union "member"); *see In re Carter*, 618 F.2d 1093, 1103 (5th Cir. 1980). By no stretch of the imagination could employees paying a representation fee be considered members of the union, "full-fledged" or otherwise. They would have none of the responsibilities of union membership, none of its "stigma," and none of its perquisites.

The NLRB has itself concluded that requiring nonunion employees to pay periodic amounts "for the support of the bargaining unit" does not make those employees "members" in the union. In *Public Service Company of Colorado*, 89 NLRB 418 (1950), the contract provision at issue stated:

> Union membership . . . shall not be required as a condition of employment, but all employees in the classifications covered by this Agreement shall, as a condition of employment, within sixty (60) days after hiring, or commencing August 1, 1947, pay to the Union Two ($2.00) Dol-

lars per month for the support of the bargaining unit.

The initial decision had concluded that because the "support money provision does not require, and is not related to a requirement of 'membership,'" it did not come within the terms of section 8(3) and could not be lawfully enforced. *Id.* at 420. After searching through the legislative history of the Wagner Act, the Board ruled to the contrary[12] *even though it agreed* that the provision required "as an employment condition something other than actual 'membership.'" *Id. See id.* at 430 (opinion of General Counsel that requiring nonmembers to pay union money "for the support of the bargaining unit" is "clearly distinguishable from a requirement of 'membership in a labor organization'").

> The argument that the "support money" requirement in the contract is necessarily contingent upon the Union's acceptance of an employee membership application finds no support in either the contract or in the statute. The Wagner Act was not concerned with an employee's right to membership in a labor union and held no guarantee of membership, even where, in a union security contract, membership *is* made a condition of employment.

*Id.* at 425. The Board reaffirmed this ruling under the 1947 Taft-Hartley amendments to the Wagner Act in *American Seating Co.*, 98 NLRB 800 (1952). It now departs from that reasoning with no legal basis for doing so.

*NLRB v. General Motors Corp.*, 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670, is not to the contrary, and indeed cuts against the position adopted by the majority. The "financial core" of membership was defined as the "payment of fees and dues." *Id.* at 742, 83 S.Ct. at 1459. As a matter of the Supreme Court's definition, then, payment of service fees in an amount less than initiation fees and dues *cannot* constitute membership. "At its core, compulsory unionism refers to mandatory payment by employees of union dues and initiation fees." *International Union, United Automobile, Aerospace and Agricultural Implement Workers v. National Right to Work Legal Defense and Educ. Foundation, Inc.*, 590 F.2d 1139, 1143 (D.C.Cir.1978). "[S]uch 'membership' includes *only* the duty to pay dues and initiation fees." *United Stanford Employees, Local 680 v. NLRB*, 601 F.2d at 982 (emphasis added). *Accord, NLRB v. Hershey Foods Corp.*, 513 F.2d at 1087; *Boilermakers Local 749 v. NLRB*, 466 F.2d 343, 344-45 (D.C.Cir.1972), *cert. denied*, 410 U.S. 926, 93 S.Ct. 1356, 35 L.Ed.2d 586 (1973).[13] The interpretation of "membership" adopted by the majority ignores these explicit holdings. *See Associated General Contractors v. Otter Tail Power Co.*, 457 F.Supp. 1207, 1217 (D.N.D.1978).

The majority therefore extends the scope of section 14(b) to an unprecedented degree. "Section 14(b) does not empower states to ban all involuntary relationships between workers and unions." *Laborer's International Union, Local 107 v. Kunco, Inc.*, 472 F.2d 456, 458 (8th Cir. 1973). It is now

---

**12.** The Board reasoned that union security clauses that fell short of requiring "membership" were nevertheless entitled to protection under section 8(3) of the Wagner Act. *See NLRB v. General Motors*, 373 U.S. at 741, 83 S.Ct. at 1458. ("We find nothing in the legislative history of the Act indicating that Congress intended the amended proviso to § 8(a)(3) to validate only the union shop and simultaneously to abolish, in addition to the closed shop, all other union-security agreements permissible under state law"); *Algoma Plywood Co. v. Wisconsin Board*, 336 U.S. 301, 307, 69 S.Ct. 584, 588, 93 L.Ed. 691 (1949) ("The short answer is that § 8(3) merely disclaims a national policy hostile to the closed shop or other forms of union-security agreement"). It should be

emphasized, however, that only union security agreements *requiring membership* derive their legitimacy from section 8(a)(3). *See* p. 1280 *infra.*

**13.** These cases are part of the long line following *Union Starch and Refining Co. v. NLRB*, 186 F.2d 1008 (7th Cir. 1951), holding that the condition of "membership" for section 8(a)(3) purposes is satisfied even when an employee in a union shop refuses to respect union-imposed obligations other than the duty to pay dues and initiation fees. The Supreme Court specifically relied on the *Union Starch* rule in *NLRB v. General Motors*, 373 U.S. at 743 n.10, 83 S.Ct. at 1460 n.10.

settled law, for example, that nondiscriminatory union-operated hiring halls may not be prohibited by state right-to-work laws under section 14(b). *See, e.g., NLRB v. Tom Joyce Floors, Inc.,* 353 F.2d 768 (9th Cir. 1965); *cf. Local 357, International Bhd. of Teamsters v. NLRB,* 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961) (exclusive hiring hall does not violate closed shop prohibition of section 8(a)(3)). Unions are further permitted to charge nonmembers a special service or referral fee for the use of the hiring hall, if the fee is reasonably related to the expenses of operating the halls. *NLRB v. Local 138, International Union of Operating Engineers,* 385 F.2d 874, 876–77 (2d Cir.), *cert. denied,* 391 U.S. 904, 88 S.Ct. 1653, 20 L.Ed.2d 418 (1968); *Local 825, International Union of Operating Engineers, AFL–CIO,* 137 NLRB 1043, 1044 (1962) (non-member must pay his "pro rata share of the cost and expense of operating the employment list and referrals therefrom" even though union members pay no fee for referrals).[14]

The majority contends that these cases are "clearly distinguishable" because use of a hiring hall "precedes hiring," and because state regulation of union membership under section 14(b) "applies only to post-hiring" arrangements. Majority opinion at 10. Both assertions are dubious. The legislative history of section 14(b) shows that Congress was *most* concerned about the evils of the closed shop, which by definition requires that union membership "precede hiring," and that Congress endorsed state right-to-work laws banning closed shops. Hiring halls were specifically discussed in the legislative history. *See* S.Rep.No.105, 80th Cong., 1st Sess. 6 (1947), Leg.Hist. at 412 ("In the maritime industry and to a large extent in the construction industry union hiring halls now provide the only method of securing employment."). More important, only a strained conception of hiring halls would suggest that they have no post-hiring consequences. In *NLRB v. Houston Chapter, Associated General Contractors of America, Inc.,* 349 F.2d 449 (5th Cir. 1965), *cert. denied,* 382 U.S. 1026, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966), the court explained that the purpose of such a hall would be to "establish a system of seniority rights and job priority" in the otherwise "transitory" construction trade. Such an arrangement undoubtedly affects the post-hiring relationship between employer and employee. The court added:

> This is a multi-employer situation where the essence of employee security would rest on job priority standards being established through a common source—the hiring hall. . . .
>
> No doubt union membership will be encouraged under the arrangement, indeed it may be a boon to the union; nevertheless such an arrangement does not constitute compulsory unionism so long as the arrangement is not employed in a discriminatory manner.

*Id.* at 452, 453. The Supreme Court has also suggested that "the very existence of the hiring hall encourages union membership. We may assume that it does." *International Bhd. of Teamsters v. NLRB,* 365 U.S. at 675, 81 S.Ct. at 839. *See Mountain Pacific Chapter,* 119 NLRB 883, 896 (1957) (early decision holding even nondiscriminatory hiring hall illegal per se because "the inference of encouragement of union membership is inescapable."). Despite their clear post-hiring consequences, union hiring halls cannot be prohibited by states under

---

**14.** The hiring hall cases again emphasize that the scope of section 14(b) does not depend on state interpretations of state right-to-work laws. In *Laborers' Int'l Union v. Kunco,* 472 F.2d 456, the court set aside the judgment of the Arkansas Supreme Court, which had held that even nondiscriminatory hiring halls violated that state's right-to-work laws in *Kaiser v. Price-Fewell, Inc.,* 235 Ark. 295, 359 S.W.2d 449 (1962). *Compare Florida Education Ass'n v. Public Employees Relations Comm.,* 346 So.2d 551 (Fla.App.1977) (right-to-work law held to prohibit contract requiring all employees to pay pro rata share of bargaining and grievance costs) *with Meade Electric Co. v. Hagberg,* 129 Ind.App. 631, 159 N.E.2d 408, 414 (1959) (right-to-work law held not to ban agency shops because of "the plain, unequivocal language" of the law: "To depart from the meaning expressed by the words of the statute is to alter it, and it is not construction but legislation . . . .").

section 14(b) because such halls do not meet the test of "compulsory unionism."[15]

The final blow to the majority's suggestion that section 14(b) governs this case because a "post-hiring" arrangement is involved comes from *SeaPak v. Industrial, Technical and Professional Employees*, 300 F.Supp. 1197 (S.D.Ga.1969), *aff'd per curiam*, 423 F.2d 1229 (5th Cir. 1970), *aff'd mem.*, 400 U.S. 985, 91 S.Ct. 452, 27 L.Ed.2d 434 (1971). The Georgia right-to-work statute provided that authorizations for deduction of union dues were revocable at the will of the employee, but the federal labor statute made such authorizations irrevocable for not more than one year. The court explained:

> Counsel vigorously maintain that employees who execute authorizations revocable only after one year but who within twelve months revoke same become forced members of the union. The employee's choice is either that of continued, compulsory "membership" in the union or of termination of employment. So they argue, and the argument has some force....

I am inevitably confronted by the question of whether there is a Federal preemption of check-off authorizations and whether § 14(b) in prohibiting agreements requiring union membership as a condition of employment permits a state to enact check-off provisions contrary to what is provided for in § 302 of the Federal Labor-Management Relations Act. 300 F.Supp. at 1199–1200. The court's answer was emphatic.

I think the state regulation must yield.... I am confident Congress did not conceive that checkoff of dues for a limited time after an employee's revocation of authorization therefor would amount to compulsory union membership as interdicted by state "Right-to-Work" laws.... After all, state prohibition of compulsory unionism is a Congressional dispensation of grace, not the imperious right of a state. I do not agree that the one year irrevocability provision in the Act can be varied by a state legislature under the reservation to the states of the power to prohibit "agreements requiring membership in a labor organization as a condition of employment." Section 14(b) says that and no more and it reaches no further.... Checkoff authorizations irrevocable for one year after date do not amount to compulsory unionism as to employees who wish to withdraw from membership prior to that time.

*Id.* at 1200–01. It is obvious that a compulsory check-off provision is a post-hiring arrangement. It is also obvious that the critical inquiry in assessing the reach of state right-to-work laws under section 14(b) is not whether they ban "post-hiring" arrangements, but whether the arrangements are a form of "compulsory unionism."

B. *Differences Between Membership Dues and Representation Fees*

I suggest that the majority errs in thinking that section 14(b) *or* section 8(a)(3) apply in this case. The majority relies on an

---

**15.** In *Machinists Local 697*, 223 NLRB 832 (1976), the Board reasoned that hiring hall precedents were not relevant to the question whether unions could charge nonmembers the actual cost of handling their grievances on the ground that unions have no obligation to operate hiring halls but do have an obligation to represent all members of the bargaining unit fairly. *Id.* at 834. As the NLRB's chairman observed in dissent, this reasoning is extremely weak. "Contrary to the majority herein, a nonmember applicant at an exclusive hiring hall is entitled as a matter of right to the services of a union without discrimination based on nonunion status.... I know of no rule, by statute or decision, prior to the instant case, and my colleagues cite none, that a union is obligated to furnish to all employees in a unit every service without charge." *Id.* at 836; *see NLRB v. Lummus Co.*, 210 F.2d 377, 381 (5th Cir. 1954). In *Local 825, Int'l Union of Operating Engineers*, 137 NLRB 1043 (1962), the Board found operation of an exclusive hiring hall nondiscriminatory even though nonunion employees paid *higher* monthly fees as their "pro rata share of the cost and expense of operating the employment list" than union members paid in monthly dues. "The fact that the fee paid by a nonmember is roughly equivalent to the monthly dues of a member is not, in our opinion, sufficient in and of itself to establish that the former has been required to pay more than his fair share for the use and operation of the hiring hall." *Id.* at 1044.

argument that any freshman student of philosophy would recognize as invalid: union members pay dues; the clause in issue would require workers to pay a fee; therefore the clause requires workers to become union members. Surely this overgeneralized statement overemphasizes "compulsory" and ignores "unionism." Unions may negotiate all manner of contracts that compel workers in the bargaining unit to meet particular terms and conditions of employment without transforming every such worker into a union member. Congress was not concerned about compulsion, but compulsory unionism. Paying fees to cover representation costs does not constitute "membership in a labor organization" because it falls short of what the Supreme Court has called the "financial core" of unionism—payment of initiation fees and dues.

The differences between membership dues and representation fees are more than a matter of dollars alone. Representation fees are payments for services rendered; membership dues support an institution. The Supreme Court has frequently noted the distinction between a union's "institutional costs" and its expenditures for collective bargaining purposes. E.g., Schermerhorn, 373 U.S. at 753, 83 S.Ct. at 1465; Machinists v. Street, 367 U.S. 740, 769–70 & n.19, 81 S.Ct. 1784, 1800–01 & n.19, 6

L.Ed.2d 1141 (1961). In Abood v. Detroit Board of Education, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), the Court reviewed the constitutionality of an agency shop arrangement under which the union spent part of its receipts on political activities with which certain employees disagreed. The Court upheld the arrangement, but only after it devised "a way of preventing compulsory subsidization of ideological activity by employees who object thereto without restricting the Union's ability to require every employee to contribute to the cost of collective-bargaining activities." Id. at 237, 97 S.Ct. at 1800.

The right-to-work laws endorsed by section 14(b) are clearly analogous to the First Amendment rights protected in Abood, because in neither setting may employees be required to support "ideological activity" with which they disagree. Like the schoolteachers in Abood, the Natchez mill employees have no obligation to subsidize the Union's institutional expenses even if they may be required to pay their fair share of collective bargaining costs.[16] But as long as these employees pay only their pro rata share of representation expenses, they cannot be considered members of the union because they are not supporting that institution. Section 8(a)(3) has nothing to do with the proposed representation fee, be-

16. To the extent that a representation fee exceeds these costs and subsidizes the union's institutional expenses, of course, it is invalid under Schermerhorn. The clause proposed by the Union in this case stated that the fee could not exceed the total of dues and fees assessed union members, and provided that the fee would only equal "a pro rata share" of the unit's collective bargaining costs. As the Supreme Court cautioned in Schermerhorn, however, these safeguards must not be "of bookkeeping significance only." 373 U.S. at 753, 83 S.Ct. at 1465. The proposed clause could raise such problems because once a union receives a pro rata share of collective bargaining costs from nonunion employees, monies in the union treasury that had formerly been used to represent those employees will be freed up to pay other, institutional expenses of the union.

Such problems seem neither significant nor insurmountable, however. For example, the union's institutional expenditures could be frozen during the period when the representation-

fee clause goes into effect, with any surplus rebated in equal shares to union and nonunion members alike. The permissible outcome would resemble that in Abood, where the Court suggested an exact method for separating monies collected for one purpose from monies collected for the other. Employees who objected to supporting the union's political activities were to receive "(1) the refund of a portion of the exacted funds in the proportion that union political expenditures bear to total union expenditures, and (2) the reduction of future exactions by the same proportion." 431 U.S. at 240, 97 S.Ct. at 1802; see Railway Clerks v. Allen, 373 U.S. 113, 120–22, 83 S.Ct. 1158, 1162–63, 10 L.Ed.2d 235 (1963); Machinists v. Street, 367 U.S. 740, 775, 81 S.Ct. 1784, 1803, 6 L.Ed.2d 1141 (1961). The accounting treatment of particular expenditures, and the amounts permissibly collectible under the instant representation-fee clause, are questions for the Board in the first instance.

cause such a fee does not require union membership as a condition of employment.

Instead, representation-fee proposals should be considered mandatory subjects of bargaining pursuant to section 8(b) of the Act, 29 U.S.C. § 158(d), which states:

> For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employee to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment. . . .

The test for determining whether a particular matter comes within the scope of section 8(d) is whether it would regulate relations between employer and employee, or settle any term or condition of employment. *NLRB v. Wooster Division of Borg-Warner Corp.*, 356 U.S. 342, 350, 78 S.Ct. 718, 723, 2 L.Ed.2d 823 (1958). The administrative law judge below specifically found that the representation fee proposed by the Union was a mandatory subject of bargaining within the meaning of section 8(d). 252 NLRB at 1303. *See NLRB v. Houston Chapter, Association of General Contractors*, 349 F.2d at 452 (contract terms "such as would provide for the establishment of a seniority system through the use of a hiring hall, no less than tenure, are terms and conditions of employment" under section 8(d)); *NLRB v. Tom Joyce Floors, Inc.*, 353 F.2d at 771 (same); *cf. NLRB v. Andrew Jergens Co.*, 175 F.2d 130, 133 (9th Cir.), *cert. denied*, 338 U.S. 827, 70 S.Ct. 76, 94 L.Ed. 503 (1949) ("Union security [maintenance-of-membership clause] is properly a 'condition of employment' within the meaning of § 9(a) of the National Labor Relations Act and hence, is within the statutory area of collective bargaining.").[17]

The legitimacy of a representation fee as a subject for collective bargaining also follows from the duty of fair representation that caused financial difficulty for Local 681 in the first place. As discussed above, this duty was "originally restricted to the prevention of racial discrimination." *Pyzynski v. New York Central R.R.*, 421 F.2d 854, 862 (2d Cir. 1970); *see Tunstall v. Brotherhood of Locomotive Firemen*, 323 U.S. 210, 211, 65 S.Ct. 235, 236, 89 L.Ed. 187 (1944). It has since been expanded to cover all cases in which the union draws distinctions that are "irrelevant and invidious." *Conley v. Gibson*, 355 U.S. 41, 46, 78 S.Ct. 99, 102, 2 L.Ed.2d 280 (1957) (quoting *Steele v. Louisville & Nashville R. Co.*, 323 U.S. 192, 203, 65 S.Ct. 226, 232, 89 L.Ed. 173 (1944)). Perhaps it may fairly be asked whether the union discrimination is truly "invidious" if it declines to prosecute grievances of nonunion employees because they pay none of the cost. But it clearly seems to constitute discrimination in reverse to suggest that whereas nonunion employees may obtain free representation, union employees must cover the costs of their grievances by paying dues. The asymmetry is itself unfair. Union efforts to combat it therefore draw an additional measure of legitimacy from the union duty to provide fair representation to its members as well as others in the bargaining unit.

Common sense and fundamental fairness rebel at the notion that a private organization can be prohibited from collecting expenses it incurs on behalf of nonmembers whom it is required by law to represent. In its most extreme formulation, such a proposition may even raise questions of a constitutional magnitude. *See, e.g., FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 602–03, 64 S.Ct. 281, 287–88, 88 L.Ed. 333 (1944); *FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 585–86, 62 S.Ct. 736, 742–43, 86 L.Ed. 1037 (1942) (defining "reasonable rates" in utility regulation as those that are "not confiscatory in the constitutional sense"). The bur-

---

17. Section 9(a), 29 U.S.C. § 159(a), parallels section 8(d) in stating:

> Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, *or other conditions of employment* . . . .

(emphasis added).

den of proof falls on those who suggest that section 14(b) reflects the adoption of such an extreme view by Congress,[18] and that burden has not been carried.

The NLRB dismisses the inequitable situation facing Local 681 by asserting that "the change must be made by Congress, not by the Board or this Court." Brief for Petitioner NLRB at 21. The suggestion is inappropriate because the problem has not been created by Congress. It is the courts, not Congress, that have required unions to expand their representational activities as collective bargaining and contract enforcement have grown in scope. It is the NLRB, not Congress, that has prohibited unions from collecting special fees from nonunion employees to cover the cost of their grievances and arbitrations. It does not usurp the role of Congress to hold section 14(b) to its terms. Nothing on the face of section 14(b) or in its legislative history allows the states to ban representation fee arrangements, because these arrangements do not constitute "compulsory unionism" or condition the right to work on loss of associational freedom. Section 14(b) was enacted to keep unions from victimizing workers, not to let nonunion workers victimize unions by demanding services without paying the costs. Section 14(b) gives the states only the authority to ban compulsory unionism. "Compulsory unionism under the Taft-Hartley Act thus has a very limited meaning." Rosenthal, *The National Labor Relations Act and Compulsory Unionism*, 1954 Wis.L.Rev. 53, 68. As the Supreme Court observed in *International Bhd. of Teamsters v. NLRB*, 365 U.S. at 674, 81 S.Ct. at 839: "There being no express ban of hiring halls in any provisions of the Act, those who add one, whether it be the Board or the courts, engage in a legislative act." The same concern should trouble those who read section 14(b) as allowing the states to prohibit valid representation fees.

## CONCLUSION

Section 14(b) expresses the policy of federal labor law, however controversial it may be. Organized labor traditionally opposes right-to-work laws, and seeks evisceration of section 14(b), but the unions may not be allowed to accomplish through litigation what they cannot obtain from Congress. By no account should my views be understood as urging an end run around the position that Congress has clearly taken.

But it seems equally injudicious for courts to ascribe to Congress a position that it has *not* taken, especially when doing so contravenes the balancing inherent in federal labor policy. The legislative history of section 14(b) utterly fails to support the majority's view of this case, and it seems irrefutable that the majority has misread *Schermerhorn* and other judicial interpretations of that statute. By extending section 14(b) far beyond its terms, the majority turns a blind eye to the model of trade union democracy so clearly contemplated by Congress. The majority offers no reason, whether rooted in judicial precedent or legislative intent or sound policy, for such a result.

Trade union democracy as contemplated by Congress has and will require judicial interpretation that is sometimes complex, but the general principles are simple. Individual workers have certain rights and freedoms that must be protected from arbitrary union action; section 14(b) is one of the mechanisms that Congress intended to protect these rights. On the other hand, the union selected as the bargaining representative is the exclusive bargaining representative not just of the majority who support it, but of the entire bargaining unit. The union therefore has obligations and responsibilities even to nonunion workers that lead

18. It is probable that Congress never considered this question at all, due to the evolution of collective bargaining in the years since the Taft-Hartley Act was passed. Before the duty of fair representation was elaborated by the courts, free riders did not directly harm unions but simply failed to benefit them. *See* pp. 1259–

1260 *supra*. This point underscores the inequity of the view that the majority now ascribes to Congress. More important, it demonstrates the total lack of support for such a holding, because Congress could hardly have intended section 14(b) to govern tensions that did not yet exist.

to a "corresponding reduction in the individual rights of the employees so represented." *Vaca v. Sipes*, 386 U.S. at 182, 87 S.Ct. at 912. Even in the states that have enacted laws pursuant to section 14(b), the mesh between unions and workers has grown tighter over the years whether that mesh is desired or not. It fully accords with the intent of Congress to take this fact into consideration when analyzing the scope of section 14(b). Workers who pay fees to cover the cost of their direct representation are not thereby transformed into members of the union because, as the Supreme Court has emphasized, "membership" means payment of dues and initiation fees that support the union's institutional expenses.

The model of trade union democracy with its problem of free riders traditionally suggests an analogy to military defense or police protection. Taxpayers receive these services whether they desire them or not, and are not permitted to reduce their taxes by the amount of "unwanted" service. The situation before us now is even more striking; the better analogy is the taxpayer who not only declines to support the police department, but who demands that it send officers to check his home every day while he is away on vacation. Even in a right-to-work state, nonunion employees cannot avoid union representation and frequently benefit directly from particular union efforts in their behalf. Letting unions recoup these costs of representation does not constitute coerced "membership" within the meaning of section 14(b). Because judicial precedent and sound policy support this conclusion, and the legislative history of section 14(b) does not foreclose it, I respectfully dissent.