WOOD, Chief Judge,
dissenting.
Today’s decision is either incorrect or it lays bare an unconstitutional confiscation perpetuated by our current system of labor law. In my view, the better view is the former: the majority has simply misunderstood the federal statutory scheme, taken as a whole. The plain language of section 14(b) of the National Labor Relations Act (NLRA) does not support such sweeping force for Indiana’s Right to Work law. Ind.Code § 22-6-6. No ruling of the Supreme Court has gone this far, and the legislative history of section 14(b) (for those who consider it relevant at all) is inconclusive. Even if, however, one thought that there were some ambiguity in the NLRA, the principle of constitutional avoidance provides a powerful reason to reject the majority’s holding. I would find sections 8(2) and 8(3) of Indiana’s statute, Ind.Code § 22-6-6-8(2), (3), preempted by federal statute. I therefore respectfully dissent.
I
It is impossible to understand what is at stake and why the majority’s resolution is in error without a brief review of the labor law regime in the United States. Inaugurated in 1935 with the passage of the Wagner Act, 49 Stat. 452, the NLRA relies on a system of exclusive representation of bargaining-unit employees. See 29 U.S.C. § 159(a). That is, if a majority of the employees in a defined section of a workforce vote in favor of a particular union to represent them, that union is required by law to represent all the workers in the bargaining unit-supporters and nonsupporters, members and nonmembers, alike. Id.; see Int’l Ass’n of Machinists v. Street, 367 U.S. 740, 760-61, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961) (“a union’s status as exclusive bargaining representative carries with it the duty fairly and equitably to represent all employees of the craft or class, union and nonunion”). (This is hardly an unfamiliar arrangement in a democracy. Even after the most hotly contested presidential election, the person who is declared the winner becomes the President *672 for all citizens, not just those who voted for him or her.) There is nothing inevitable about our system of labor law; it can be contrasted with a hypothetical regime that is more protective of minority or members-only unions, under which employees who want to bargain collectively might be free to form a members-only union and interact with their employer on that basis. But, to repeat, that is not the system that the United States has adopted.
Consequences flow from the union’s status as the exclusive representative of all members of the bargaining unit. The most significant is what is known as the duty of fair representation. See Steele v. Louisville & N.R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944) (recognizing the duty of fair representation under the Railway Labor Act); Ford Motor Co. v. Huffman, 345 U.S. 330, 337-38, 73 S.Ct. 681, 97 L.Ed. 1048 (1953) (extending duty of fair representation to the National Labor Relations Act). The duty of fair representation requires the exclusive bargaining representative (i.e., the union) to “serve the interests of all members [of the bargaining unit] without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.” Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). This duty is not limited to the negotiation process; it covers all union representational activity. See id. at 190-91, 87 S.Ct. 903 (duty of fair representation extends to grievance and arbitration); Air Line Pilots Ass’n, Int’l v. O’Neil, 499 U.S. 65, 67, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991) (“We hold that the rule announced in Vaca ... applies to all union activity....”). The Supreme Court’s opinion in Abood v. Detroit Bd. of Educ., 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), summarized the scope of those duties well:
The designation of a union as exclusive representative carries with it great responsibilities. The tasks of negotiating and administering a collective-bargaining agreement and representing the interests of employees in settling disputes and processing grievances are continuing and difficult ones. They often entail expenditure of much time and money.... The services of lawyers, expert negotiators, economists, and a research staff, as well as general administrative personnel, may be required. Moreover, in carrying out these duties, the union is obliged fairly and equitably to represent all employees ..., union and nonunion, within the relevant unit.
Id. at 221, 97 S.Ct. 1782 (internal citation and quotation marks omitted).
As this passage acknowledges, a major part of the work assigned to most unions under collective bargaining agreements relates to the administration of the grievance procedure. Grieving and arbitrating claims is not cheap. The website of the Teamsters union informs its members that 78% of their dues “stay with your local union” for a variety of purposes, including the retention of “[attorneys to assist in negotiations, grievances, and arbitration.” See http://teamster.org/about/frequently asked-questions-faq#faq06 (this and all other websites cited in this opinion were last visited August 29, 2014). The Labor Arbitration Rules of the American Arbitration Association, available by following the links in the Rules & Procedures tab at http://www.adr.org, outline a comprehensive process that obviously costs real money. It is no stretch to estimate that the cost of pursuing many grievances from initial investigation through arbitration can reach into the thousands of dollars, representing the time of the affected employee and his union representative, witness and travel costs, arbitrator fees, and the cost of *673 outside legal counsel. The duty of fair representation requires the union to absorb these costs whether or not the aggrieved employee is a union member.
Note the significant asymmetry embedded in this system. While the union is required to represent all persons in the bargaining unit fairly and equally, each one of these people is entitled to decide whether to become a member of the union. Those who opt to become members will pay their union dues, which cover both activities such as collective bargaining, contract administration, and grievances (to which I refer as representational activities) and a variety of ancillary political or ideological activities (to which I refer as ancillary activities). But what of those who choose not to become members? It has been established for years that they may not be compelled to pay for the ancillary activities, no matter what the label placed on that payment. See Commc’ns Workers of Am. v. Beck, 487 U.S. 735, 738, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988). So any question of compelling support for speech with which the nonmember disagrees is off the table.
Until now, however, reimbursement for the benefits that the union must confer on the nonmember has been a different matter, and for good reason. If there is no way to compel the nonmember employee to pay the actual cost of the services the union is obligated to provide for him, a classic “free-rider” problem arises. Free-riding is a potential problem whenever a collective good (such as the union services here) is involved. If the good (or service) can be priced individually (that is, the seller can ensure that only the buyer obtains the benefit), free-riding will not be a problem. But if each person in the group obtains the benefit of the collective good whether or not she pays for it, then there is a risk that the supply of the good will diminish, or in the limiting case will disappear altogether. See generally Earl R. Burbaker, Free Ride, Free Revelation, or Golden Rule? 18 J.L. & Econ. 147, 149-150 (1975); Russell B. Korobkin & Thomas S. Ulen, Law /;and Behavioral Science: Removing the Rationality Exception from Law and Economics, 88 Calif. L.Rev. 1051, 1139 (2000). Thus, for example, the realization of the risk of free-riding by distributors who did not want to provide services that manufacturers valued led antitrust law to change from a per se prohibition of vertical restraints to a rule-of-reason approach. See Cont’l T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007). In our situation, the nonmember of the union will reap the benefits of being represented by the union during a grievance, for instance, but he will pay nothing for those benefits, which might include a lay representative, maybe even a lawyer, investigative services, and so on-all things that cost the union real dollars to provide. In short, he will take a “free ride” on the dues that the union members make to the union.
The same problem arises in a unionized workplace (that is, a workplace in which a majority of the employees have voted to have a union represent them, in an election supervised by the National Labor Relations Board, or NLRB). Because all members of the bargaining unit benefit as a matter of right from the union’s representational activities regardless of whether they join the union, there is an incentive for employees in the bargaining unit “to refuse to contribute to the union while obtaining benefits of union representation that necessarily accrue to all employees.” Abood, 431 U.S. at 222, 97 S.Ct. 1782. The benefits in this case, as in most, extend well beyond the boost from union speech *674 that the Supreme Court found inadequate to support a rule requiring nonmember fair share contributions in Harris v. Quinn, — U.S. -, 134 S.Ct. 2618, 2636-37, 189 L.Ed.2d 620 (2014). I discuss Hams in more detail below.
The question is therefore whether the law as it stands today includes a solution to the potential free-rider problem. If it does, by creating a way to require nonmembers to pay for actual benefits received, then all is well. If it does not, then issues of constitutional magnitude arise. As the Supreme Court has recognized, “[t]o compel employees financially to support their collective-bargaining representative has an impact upon their First Amendment interests.” Id. But to exempt employees from reimbursing a service provider for work performed creates a different constitutional issue-—one that the Supreme Court has had little to no occasion to discuss. But we can glean something from Phillips v. Washington Legal Foundation, 524 U.S. 156, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998), which addressed the question whether interest income generated by funds in lawyers’ trust accounts (IOLTA) was the private property of the client. The Court held that it was. That holding raised the question whether clients could be compelled to donate their property to a foundation that provided legal services to the indigent. In Brown v. Legal Foundation of Washington, 538 U.S. 216, 123 S.Ct. 1406, 155 L.Ed.2d 376 (2003), the Court held that if the state wished to require the client’s property to be transferred from the IOLTA account to the foundation, its action had to be judged under the Takings Clause of the Fifth Amendment. It held that the clients’ property had been taken for a public use when it was turned over, see 538 U.S. at 235, 123 S.Ct. 1406, but that no compensation was due, because the petitioners’ net loss was zero. Id. at 240, 123 S.Ct. 1406.
The lesson from the IOLTA cases for us is that a state law compelling one private party to give property to another private party must be assessed under the Takings Clause. The fact that those two cases involved money, while our case involves the compulsory provision of services, is of no moment. (This, incidentally, shows why the plaintiffs have sued the correct party: it is the Indiana law that is compelling them to donate valuable services to the nonmembers of the unions, just as it was state law in Phillips and Brown that compelled clients to donate their money to the legal foundations. Compare ante at 665.) Services cost money to provide: union representatives must be paid, union lawyers must be paid, and collective bargaining is not free. Justice Scalia flagged this problem in his separate opinion in Lehnert v. Ferris Faculty Ass’n, 500 U.S. 507, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991) (concurring in judgment in part, dissenting in part):
Where the state imposes upon the union a duty to deliver services, it may permit the union to demand reimbursement for them; or, looked at from the other end, where the state creates in the nonmembers a legal entitlement from the union, it may compel them to pay the cost. The “compelling state interest” that justifies this constitutional rule is not simply elimination of the inequity arising from the fact that some union activity redounds to the benefit of “free-riding” non-members; private speech often furthers the interests of nonspeak-ers, and that does not alone empower the state to compel the speech to be paid for. What is distinctive, however, about the “free riders” who are nonunion members of the union’s own bargaining unit is that in some respects they are free riders whom the law requires the union to carry—indeed, requires the un *675 ion to go out of its way to benefit, even at the expense of its other interests. In the context of bargaining, a union must seek to further the interests of its nonmembers; it cannot, for example, negotiate particularly high wage increases for its members in exchange for accepting no increases for others. Thus, the free ridership (if it were left to be that) would be not incidental but calculated, not imposed by circumstances but mandated by government decree.
Id. at 556, 111 S.Ct. 1950. Lehnert itself dealt with limitations on the use by public-sector unions of dissenters’ contributions. The Court’s holding that the state constitutionally was not permitted to compel its employees to subsidize legislative lobbying or other political activities in no way undermines the force of Justice Scalia’s observations about the free-rider problem as it relates to the representational services that the unions must provide to nonmembers.
Acting wholly within the boundaries of the governing legislation, the Supreme Court has reconciled the costly duties imposed by law on unions with the rights of workers who do not wish to participate in (or pay for) that union’s nonrepresentational activities. It has done so by drawing a line between what non-union members of a bargaining unit can and cannot be compelled to pay the union. Pursuant to section 8(a)(3) of the NLRA, 29 U.S.C. § 158(a)(3), unions and employers may require all employees within a bargaining unit (union members and nonmembers alike) to pay the union for the costs associated with the union’s collective bargaining and contract administration functions. See, e.g., Beck, 487 U.S. at 738, 108 S.Ct. 2641. Beck held that although section 8(a)(3) of the Act permits an employer and a union to enter into an agreement under which all employees must make certain payments to the union (essentially reimbursing the union for services promised and rendered), it does not permit the union to collect funds from objectors for activities “unrelated to collective bargaining, contract administration, or grievance adjustment.” Id.
My colleagues believe that Beck characterizes those objectors as union “members,” and indeed at one point the Court says that “the ‘membership’ that may be so required [by section 8(a)(3) ] has been ‘whittled down to its financial core.’ ” Id. at 745, 108 S.Ct. 2641. But all the Court is talking about at that point in the opinion is what can be compelled of employees. Elsewhere, it makes clear that the Beck objectors were not union members. How else can one read the statement at the beginning of the opinion, where the Court says “[i]n June 1976, respondents, 20 employees who chose not to become union members, initiated this suit....” Id. at 739,108 S.Ct. 2641 (emphasis added). The majority has effectively deleted from the Court’s Beck opinion its statement of the precise issue it was deciding:
Today we must decide whether this provision also permits a union, over the objections of dues-paying nonmember employees, to expend funds so collected on activities unrelated to collective bargaining, contract administration, or grievance adjustment, and, if so, whether such expenditures violate the union’s duty of fair representation or the objecting employees’ First Amendment rights.
Id. at 738, 108 S.Ct. 2641 (emphasis added).
To justify its decision to assign the status of statutory “members” to nonmembers of the union, the majority seizes on the comment to which I just referred, to the effect that the 1947 amendments to the NLRA “whittled down” the term “membership” in the statute to its “financial *676 core.” This language came directly from NLRB v. General Motors Corp., 373 U.S. 734, 742, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963), and so in order to understand it, we must look at that decision. When one does so, it is apparent that the majority’s reading cannot stand. Nothing in either General Motors or Beck wiped out the concept of non member in the course of defining the term “member.” The passage in General Motors from which that quote is lifted is prefaced by the statement that “[u]nder the second proviso to § 8(a)(3), the burdens of membership upon which employment may be conditioned are expressly limited to the payment of initiation fees and monthly dues.” Id. (emphasis added). The Court did not equate “initiation fees and monthly dues” to the fair-share payment that it recognized a quarter century later in Beck. The only point it was making in General Motors was that a duty to pay both initiation fees and monthly dues was enough to make someone a “member,” even if the union disclaimed the idea that membership went along with those payments. Reality, in other words, is what governs; not labels. Unsurprisingly, people who are compelled to pay precisely the same amount as union members pay should be considered de facto members. With this background in mind, the majority’s rationale for disregarding the Court’s own description of the issue that it decided in Beck falls apart. Beck makes clear that objectors are not members, but that they can be compelled to pay for the services that they consume.
In so doing, Beck fine-tunes the rules governing a recognized union, on the one hand, and the nonmembers for whom the union is responsible, on the other. It does so by holding that while the collection of dues unrelated to collective bargaining (and other representational activities such as the handling of grievances) would violate the First Amendment rights of the nonmembers, federal law nevertheless entitles the union to collect fees “fixed by their underlying purpose—defraying the costs of collective bargaining.” Beck, 487 U.S. at 759, 108 S.Ct. 2641. Interestingly, the Court alluded to the free-rider issue when it recognized that the legislative justification for section 8(a)(3) was to “en-sur[e] that nonmembers who obtain the benefits of union representation can be made to pay for them____” Id.
Before turning to the way in which these principles apply to the case before us, I add a few words about the Supreme Court’s recent decision in Harris v. Quinn, supra. The question in Harris was “whether the First Amendment permits a State to compel personal care providers to subsidize speech on matters of public concern by a union that they do not wish to join or support.” 134 S.Ct. at 2623. The Court answered that question in the negative. It held that the personal care workers could not be required to pay even the agency fee that Abood had authorized, in the unusual circumstances of their workplace. The Court stressed the fact that the difference between core union speech and issues such as wages, pensions, and benefits for public employees is far more elusive than it is for private employees. It commented on “the conceptual difficulty of distinguishing in public-sector cases between union expenditures that are made for collective-bargaining purposes and those that are made to achieve political ends.” Id. at 2632. The Court also found significant the fact that the personal care assistants were hardly public employees at all: they were hired, fired, and supervised by the client, and they were not eligible for a host of state benefits. This unusual status, it wrote, “has important implications” for the ability of the union to charge an agency fee. Id. at 2636. Abood’s rationale “is based on the assumption that *677 the union possesses the full scope of powers and duties generally available under American labor law.” Id.
In Harris, practically the only thing the union was doing was presenting its views to the state. It could not set wages, which were established by law, and it had no authority over grievances. In that setting, all that was left was speech. Wellestabl-ished principles entitled the objectors to refuse to pay a fee that could only be subsidizing that speech. The Court uncovered nothing of value that the union was compelled to furnish to the objectors, and so it had no occasion to worry about any compelled transfer of property or services.
The case before us does not share those distinguishing features of Harris. It concerns private employers and private employees, not state employees. The rights of employees who are not union members to refrain from subsidizing union speech are fully protected by their entitlement to give the union only a “fair share” that is capped by the costs of representational activity. The Harris Court itself recognized that the case before it lacked all of the features that have been understood to justify the agency fee:
What justifies the agency fee, the argument goes, is the fact that the State compels the union to promote and protect the interests of nonmembers. Ibid. Specifically, the union must not discriminate between members and nonmembers in “negotiating and administering a collective-bargaining agreement and representing the interests of employees in settling disputes and processing grievances.” Ibid. This means that the union “cannot, for example, negotiate particularly high wage increases for its members in exchange for accepting no increases for others.” Ibid. And it has the duty to provide equal and effective representation for nonmembers in grievance proceedings, see 111. Comp. Stat. Ann., ch. 5, §§ 315/6, 315/8, an undertaking that can be very involved. See, e.g., SEIU: Member Resources, available at www.seiu.or/a/members/disputes-and-grievances-rights-procedures-and-best-practices.php (detailing the steps involved in adjusting grievances).
134 S.Ct. at 2636-37. Every one of the features that was missing in Harris is present in the case before us. I therefore conclude that nothing in Harris undermines either Beck or the analysis I have described thus far.
II
The question before us is how these principles operate when a state chooses to adopt a so-called “right-to-work” law (either by statute or in its constitution). Indiana has passed such a law. See Ind. Code § 22-6-6. Federal law leaves some room for such state laws, pursuant to section 14(b) of the NLRA, 29 U.S.C. § 164(b). But the question is whether state law can command the union (a private organization) to perform uncompensated services for other private parties (the nonmembers). If the federal labor laws preempt this kind of state law, then the state law must yield. If the federal statute either authorizes this kind of taking or is silent, then we must move to the constitutional issues to which I have alluded.
Bearing in mind that we should always consider statutory arguments first, see, e.g., Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng’rs, 531 U.S. 159, 162, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001), I analyze the NLRA before tackling any constitutional issue. We all agree that the pivotal section of the NLRA is section 14(b), 29 U.S.C. § 164(b). Section 14(b) was added to the NLRA in 1947 by the Taft-Hartley Act, 61 Stat. 151, as part *678 of an effort to rein in certain union practices that Congress regarded as abusive. Entitled “Agreements requiring union membership in violation of State law,” section 14(b) states that:
Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.
29 U.S.C. § 164(b) (emphasis added). This is the language that we must construe. The question is what it means to say that states can prohibit agreements requiring “membership” in a labor organization as a condition of employment. More particularly, we must decide whether section 14(b) authorizes the sweeping prohibitions found in Indiana’s Right to Work law. Plaintiffs challenge both section 3 and section 8 of that law, Ind.Code §§ 22-6-6-3 and 22-6-6-8, but I agree with the majority that section 3 adds nothing to the picture. I therefore focus on subparts 2 and 3 of section 8, which provide as follows in relevant part:
A person may not require an individual to:
(2) pay dues, fees, assessments, or other charges of any kind or amount to a labor organization; or
(3) pay to a charity or third party an amount that is equivalent to or a pro rata part of dues, fees, assessments, or other charges required of members of a labor organization;
as a condition of employment or continuation of employment.
Ind.Code § 22-6-6-8 (emphasis added).
“Statutory interpretation begins with the plain language of the statute.” United States v. Berkos, 543 F.3d 392, 396 (7th Cir.2008). Courts should assume that “the purpose of the statute is communicated by the ordinary meaning of the words Congress used; therefore, absent any clear indication of a contrary purpose, the plain language is conclusive.” United States v. Ye, 588 F.3d 411, 414-15 (7th Cir.2009). My colleagues read the word “membership” oddly, as a word that describes both union members and nonmembers of the union. Nonmembers somehow morph into members, they say, if the nonmembers are required to pay the union any thing, even a fee limited to reimbursement for the services that federal law insists they are entitled to receive from the union. By this logic, I become a member of Chicago’s University Club the minute I so much as pay for my dinner at an event hosted there. This would come as a surprise to both the Club and me. One might even ask if money is significant at all: I assume that nonmembers who enjoy union services for free fall outside even the majority’s definition of “membership,” though I do not know why that should be the case, if they are still being represented by the union. The majority believes that its interpretation of section 14(b) is compelled by the language of the NLRA, as interpreted by the Supreme Court. In addition, it relies very heavily on the legislative history of the Taft-Hartley Act, ante at 662-65. With respect, I do not agree with its reading of the statutory language, and I cannot agree that the legislative history has any particular persuasive value.
The decisions known as Retail Clerks I and II marked the first time the Supreme Court addressed a state’s power under section 14(b). See Retail Clerks Int’l Ass’n, Local 1625 v. Schermerhorn, 373 U.S. 746, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963) (Retail Clerks I) and Retail Clerks Int’l Ass’n, Local 1625 v. Schermerhorn, *679 375 U.S. 96, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963) (Retail Clerks II). In Retail Clerks I the Court reviewed an agency-shop agreement under which all employees at the company were required to pay full union fees, whether or not they were union members. The Court had held in General Motors that an agency shop clause that was not prohibited by state law was a permissible subject of collective bargaining. 373 U.S. at 735, 83 S.Ct. 1453. But General Motors arose in Indiana, which at the time permitted agency-shop agreements; Retail Clerks I, in contrast, arose in Florida, which has a right-to-work law that forbade these arrangements. Relying on section 14(b) and the right-to-work legislation, the plaintiffs (non-unionized employees) brought a lawsuit seeking a declaration that the agency-shop provision was void. Defendants argued, inter alia, that section 14(b) gave states only the power to prohibit agreements that required “membership” in labor organizations. Agency-shop agreements, defendants pointed out, did not require membership; they “merely” required nonmembers to pay fees equal to membership fees. This, defendants urged, was compatible with the statute.
The district court found that the state’s right-to-work law outlawed not only union shops (under which union membership could be compelled) but also agency shops. The Supreme Court affirmed, finding that “[a]t the very least, the agreements requiring ‘membership’ in a labor union which are expressly permitted by the proviso [to 8(a)(3) ] are the same ‘membership’ agreements expressly placed within the reach of state law by § 14(b).” 373 U.S. at 751, 83 S.Ct. 1461. Pointing to General Motors, the Court found that agency-shop arrangements “which impose[] on employees the only membership obligation enforceable under § 8(a)(3) by discharge, namely, the obligation to pay initiation fees and regular dues—is the ‘practical equivalent’ of an ‘agreement requiring membership in a labor organization as a condition of employment.’ Whatever may be the status of less stringent union security arrangements, the agency shop is within § 14(b).” Id. at 751-52, 83 S.Ct. 1461 (emphasis added).
As the statement just highlighted demonstrates, the Court was careful in Retail Clerks I to leave for another day the status of less comprehensive arrangements. It observed that the petitioners originally had likened their case to the General Motors agency shop. 373 U.S. at 752 n. 4, 83 S.Ct. 1461. Only later, upon briefing and argument, did they try to distinguish then-situation from the full-blown agency shop. Id. At that late hour, they argued that the clause in their agreement provided that nonunion employees would contribute to the union “for the purpose of aiding the Union in defraying costs in connection with its legal obligations and responsibilities as the exclusive bargaining agent of the employees in the appropriate bargaining unit.” Id. at 752, 83 S.Ct. 1461. The petitioners asserted that this language confined payments from nonmembers “to collective bargaining purposes alone” and prohibited the union from using the payments “for institutional purposes unrelated to its exclusive agency functions.” Id.
The Supreme Court rejected this last-minute attempt to distinguish General Motors. It pointed out that contrary to the petitioners’ suggestion, the clause at issue imposed “no ironclad restriction” on what the union could do with the payments it received from nonmembers, and thus there was no safeguard against the union’s use of the money for “institutional items.” Id. at 753, 83 S.Ct. 1461. In addition, because the proposed “service fee” was set at an amount equal to the union’s initiation fees and dues, which could be used for any number of purposes, there was no guarantee that a nonmember would not pay more *680 of the union’s collective bargaining costs “than his pro rata share.” Id. at 754, 83 S.Ct. 1461. The Court explained:
If the union’s total budget is divided between collective bargaining and institutional expenses and if nonmember payments, equal to those of a member, go entirely for collective bargaining costs, the non-member will pay more of these expenses than his pro rata share. The member will pay less and to that extent a portion of his fees and dues is available to pay institutional expenses. The union’s budget is balanced. By paying a larger share of collective bargaining costs the nonmember subsidizes the union’s institutional activities.
Id. Accordingly, there was no reason why the clause should, “in the present posture of the case, be construed against respondent to raise a substantial difference between this and the General Motors case.” Id. at 752, 83 S.Ct. 1461. It would be anomalous, the Court said, to let a state ban agency-shop agreements under which union members and nonmembers paid equal shares while forbidding it to ban an arrangement in which nonmembers might pay even more bargaining costs than members. Id. at 754, 83 S.Ct. 1461.
Retail Clerks I thus stands only for the proposition that a union may not do an end-run around section 14(b) by imposing financial éxactions on nonmembers exactly equal to the charges borne by members. As I already have noted, Retail Clerks I reserved the status of more genuine accommodations to nonmembers for another day. This is that day, for our court. Indiana’s flat prohibition against agreements between employers and unions under which a union nonmember cannot be charged even for legally required and bona fide representational activities goes well beyond the de faco membership the Supreme Court considered in Retail Clerks I.
Well-established principles of labor preemption also stand in the way of the majority’s result. While there is no express preemption clause in the NLRA, the Supreme Court has recognized that its preemptive reach is broad. See Benjamin I. Sachs, Despite Preemption: Making Labor Law in Cities and States, 124 Harv. L.Rev. 1153, 1154 (“It would be difficult to find a regime of federal preemption broader than the one grounded in the ... (NLRA)”). In Garmon, the Supreme Court held that states may not regulate activities even “arguably” protected or prohibited by federal labor law. San Diego Bldg. Trades Council, Etc. v. Garmon, 359 U.S. 236, 245, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). In Machinists, it went even further, finding that state regulation of union activity that was neither protected nor prohibited by federal labor law was preempted, as “Congress intended that the conduct be ... left ‘to be controlled by the free play of economic forces’ ” and “not be regulable by States any more than by the NLRB.” Lodge 76, Int’l Ass’n of Machinists v. Wis. Emp’t Relations Comm., 427 U.S. 132, 149, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). Against this backdrop, I believe that we are not free to read section 14(b) as the majority does. It is instead a narrow exception to an otherwise encompassing preemption regime.
In other section 14(b) cases courts have struck down similarly restrictive state laws as outside the scope of section 14(b) and therefore preempted. For example, in N.L.R.B. v. Houston Chapter, Associated Gen. Contractors of Am., Inc., 349 F.2d 449 (5th Cir.1965), the Fifth Circuit held that a demand for a nondiscriminatory hiring-hall clause by the union did not fall within the area carved out for state regulation by section 14(b) and thus the state was preempted from banning it. The court explained its decision as follows:
*681 It is true that the terms of § 14(b) as well as the legislative history suggest the intent on the part of Congress to save to the states the right to prohibit compulsory unionism. However, the long and the short of this matter is that § 14(b) contemplates only those forms of union security which are the practical equivalent of compulsory unionism. Membership in the union is not compulsory under the clause here in question .... No doubt union membership will be encouraged under the arrangement, indeed it may be a boon to the union; nevertheless such an arrangement does not constitute compulsory unionism so long as the arrangement is not employed in a discriminatory manner.
Id. at 453 (internal citations omitted). The Eighth Circuit made the same point in Laborers’ International Union, Local 107 v. Kunco, Inc., 472 F.2d 456 (8th Cir.1973), where it commented that “[sjection 14(b) does not empower states to ban all involuntary relationships between workers and unions. It merely allows the prohibition of ‘agreements requiring membership in a labor organization as a condition of employment....’ ” Id. at 458. See also Local Union No. 415 of Int’l Bhd. of Elec. Workers v. Hansen, 400 P.2d 531, 536-37 (Wyo. 1965) (finding preempted statute providing that “no person is required to have any connection with” a labor organization as a condition of employment or continued employment).
It is true, as my colleagues point out, that the Court of Appeals for the District of Columbia decided 32 years ago that the assessment of even representational fees against nonunion members was an unfair labor practice in a right-to-work state. See Int’l Union of the United Ass’n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus. of the U.S. & Canada, Local Unions Nos. 141,229,681, & 706 v. N.L.R.B., 675 F.2d 1257, 1267-68 (D.C.Cir.1982). But the Plumbing & Pipe-fitting decision cannot be reconciled with the Supreme Court’s later Retail Clerks decisions nor with the distinction that Beck drew between the limited obligations that nonmembers retain and those voluntarily borne by union members. Judge Mikva’s dissenting opinion was, in my view, prescient; it also provides a useful and comprehensive review of the legislative history of section 14(b) that supports the conclusion he would have reached (and that I reach here). See Id. at 1268-75. Rather than repeat Judge Mikva’s account, I mention only a few of the highlights for the benefit of those who regard legislative history as a useful tool, in order to illustrate the fact that the pieces of legislative history the majority has found do not represent either the last or the only way to look at it.
As I noted at the outset, modern American labor law began with the passage of the Wagner Act in 1935. Enacted against the backdrop of significant violence between workers and employers at the beginning of the 20th century, the Wagner Act gave workers the right to organize in unions and to bargain collectively with their employers. After World War II, however, there was a feeling by some in Congress that the pendulum had swung too far in the direction of unionization. In particular, closed-shop agreements, under which an employer agreed to hire union members only, were thought by some members of Congress to be a powerful tool that union leaders were abusing. On the other hand, the very same members of Congress were sympathetic toward other union security agreements. In response, Congress passed the Taft-Hartley Act of 1947, 61 Stat. 151. Taft-Hartley introduced many changes to the NLRA, some administrative, some substantive. Like most legislation, it reflected a compromise, *682 in this case between union and management interests. Congress “added provisions making it more difficult for workers to obtain a union shop (ie., a workplace in which the employer is free to hire anyone, but new employees can be required to join the union after hire), but [] retained the union shop as a mandatory subject of bargaining in section 8(a).” Plumbing & Pi-pefitting Indus., 675 F.2d at 1272.
The legislative history of section 14(b) indicates that the drafters understood it as a reaffirmation of the original NLRA:
It was never the intention of the National Labor Relations Act, as is disclosed by the legislative history of that act, to preempt the field in this regard so as to deprive the States of their powers to prevent compulsory unionism. Neither the so-called “closed shop” proviso in section 8(3) of the existing act nor the union shop and maintenance of membership proviso in section 8(a)(3) of the conference agreement could be said to authorize arrangements of this sort in States where such arrangements were contrary to the State policy. To make certain that there should be no question about this, section 13 was included in the House bill. The conference agreement, in section 14(b), contains a provision having the same effect.
Id. at 1272 (citing H.R. Conf. Rep. No. 510, 80th Cong., 1st Sess. 60 (1947), Leg. Hist, at 564). As Judge Mikva pointed out, the “predominant if not the only purpose of section 14(b) was to provide yet one more check on the abuses that could exist under compulsory unionism.” Id. at 1273. But what did that mean? Congress did not define what it meant by the key term for our purposes, “compulsory unionism.” Individual members, however, gave examples indicating that they were thinking of the closed shop or occasionally the union shop; no one breathed a word about the legitimacy of requiring nonmembers of the union to pay for services that the union was legally compelled to give them.
The majority notes that as of the time Taft-Hartley was under consideration, 12 states had right-to-work laws in effect, and that the laws of seven in that group included language similar to that found in the Indiana law before us. Ante at 661-62. From this fact, it infers that Congress must have intended to endorse all 12 of the state laws in effect. But we have no idea what Congress as a whole thought, and in the end it is beside the point. We can assume that some members who voted for Tafl>-Hartley believed, or hoped, that each one of the 12 state laws would be free to operate in the broadest possible way. Others who voted for the bill might have expected each state statute to be tested in the courts, which after all are the institution with the final authority to “say what the law is.” Marbury v. Madison, 1 Cranch (5 U.S.) 137, 2 L.Ed. 60 (1803). Since the language varied from statute to statute, the latter expectation would have been far from unreasonable. “Statutes are drafted by multiple persons, often with conflicting objectives.” Frank H. Easter-brook, Judges as Honest Agents, 33 Harv. J.L. & Pub. Pol’y 915, 922 (2010). The safest course is therefore to look at the language of the statute, in context of course, and to reason from there.
As the line the Supreme Court drew between the General Motors decision and the Retail Clerks case demonstrates, section 14(b) allows states to opt out of anything resembling a union shop or an agency shop. But it does not permit them to allow any worker who wishes to free-ride on the union’s mandatory efforts on the nonmember’s behalf to do so. Without the protection of section 14(b), sections 8(2) and (3) of the Indiana statute must fall under normal preemption analysis.
*683 III
If, contrary to my analysis, one were to conclude that Indiana has worked out a way to conscript the union into providing uncompensated services to anyone who decides to opt out of union membership, it would become necessary to decide whether such a rule is permissible under the Takings Clause of the Fifth Amendment, as applied to the states under the Fourteenth Amendment. The majority is sufficiently worried about this possibility that its first response is to suggest that the plaintiffs have forfeited the point. Ante at 665-66. I disagree with them. First, we are not compelled to invoke forfeiture rules in civil cases, and given the importance of this question, I would not duck the issue on that basis. Second, plaintiffs have argued throughout that the Indiana statute is unconstitutional, and at least one Indiana court has come to the conclusion that it indeed effects a taking under the state constitution. See Sweeney v. Zoeller, No. 45D01-1305-PL-52 (Super. Ct. of Lake Cnty. Sept. 5, 2013). Plaintiffs called that decision to our attention. If the law falls on state grounds, so be it; our case will be moot. But if the higher state courts ultimately uphold the law under the state constitution, however, the federal constitutional issue will remain. In my view, the issue has been preserved adequately and even if it has been raised only indirectly, we should reach it.
Given the IOLTA cases and the confiscatory nature of the Indiana statute, which requires unions to provide services for free to the objectors, if there is no preemption, then I would feel compelled to find a taking. (Principles of federal preemption do not permit us to use the justification that the majority raises: they believe that this is all the fault of the duty of fair representation in federal law. Ante at 666. But it is not up to the state to override that duty; we must take it as a given.) The two most basic economic rights enjoyed in the United States are (1) that the government may not confiscate private property for public use without just compensation, and (2) that the takings power must be exercised for a public purpose, and so the government may not take the property of one private party for the sole purpose of transferring it to another private party, regardless of whether “just” compensation is paid. See Kelo v. City of New London, Conn., 545 U.S. 469, 477, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005). The majority, unfortunately, has given a green light to just such an uncompensated private transfer. It does so by holding that states can categorically prohibit unions and employers from requiring nonmembers to reimburse the union for the costs the union is federally obligated to incur. Even in Kelo, the taking of one person’s property in order to transfer it to a second private party was justified by the alleged public purpose of economic redevelopment. See id. at 494, 125 S.Ct. 2655 (O’Connor, J., dissenting). Here, no public purpose is even alleged.
How this can be anything but an unconstitutional taking I do not know. I am aware of no precedent in other areas to support it. We would be shocked by a rule providing that, as a condition of receiving a business license in a city, a company selling gasoline had to give it away to any customer who did not want to pay. Or, to take another example, think of the cooperative buying associations that small businesses often create so that they can enjoy economies of scale. See, e.g., Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985). Under the majority’s rule, a state could compel the association to furnish products even to nonmembers—perhaps even for free—if that nonmember objected to an association rule requiring all members to include con *684 traceptive services in their health insurance plans. The representational services that unions provide cost real money. That is most apparent when the grievance process is at stake, but the negotiation of a collective bargaining agreement cannot be done at zero cost.
The majority makes the surprising assertion that the union’s “seat at the bargaining table” somehow compensates it for the myriad real costs it incurs on behalf of nonmembers. Ante at 666-67. That idea does not hold up under any level of scrutiny. First, this suggestion fundamentally misunderstands how the union obtains its seat at the bargaining table. The union does so if and only if it succeeds in winning a representational election sponsored by the NLRB; it does not win that seat either through the grace of the employer or in exchange for some kind of quid pro quo from either the employer or the bargaining-unit employees (i.e., “you cover the expenses of collective bargaining and grievance processing, and in exchange we’ll let you participate in the process”). Second, the majority seems to think that the employer receives no benefits from collective bargaining, but that is not true either. Collective bargaining agreements commonly include such features as no-strike clauses, management rights clauses, and a grievance procedure, all of which are a win-win for both labor and management. Third, the majority’s hypothesis is flatly inconsistent with the Supreme Court’s reasoning in Beck and Abood, among other cases that recognized the tangible value of the services that nonmembers and objectors receive as a result of the duty of fair representation. Finally, even if there were anything to the point, it would apply at most to the collective bargaining portion of the union’s duties, not to the administration of the contract and the costly grievance procedures. For all these reasons, the majority cannot avoid the confiscatory regime it has endorsed by pointing to a certified union’s right to represent the workers.
None of this would be a problem if unions were permitted to deny services to nonmembers, but they are not, and I am not sure they would want to be. (That, however, is a question for another institution and another day.) Unless or until that aspect of our labor law is changed by Congress, the only constitutional path is to permit unions to charge fees to nonmembers that cover only the limited, mandatory representational services that the nonmembers receive. The majority has forbidden this, and has thus sanctioned the confiscation of one private party’s resources for the benefit of another private party. I cannot sign on to that result.
IV
As I have explained, I do not agree with the majority’s decision to define the term “member” for purposes of section 14(b) to include both members and nonmembers. The Supreme Court’s decisions in Retail Clerks and Beck, as well as its decisions in Phillips and Brown, point us in the right direction. Under them, the proper accommodation between state authority to adopt a “right-to-work” approach and the national labor laws is one under which the states may insist that no employee be required to become a member of a union, but at the same time, nonmembers must pay for the services that the unions are required by law to render to them. Supreme Court precedent, Board precedent, and the legislative history of the statute all support this approach. And if it is wrong and the majority is correct, we have a constitutional problem on our hands. In our country, the state is not entitled to force private organizations or persons to render uncompensated services to others. The Takings *685 Clause, which applies to the states, says as much. Principles of constitutional avoidance therefore support the ruling that I advocate. If Congress wants to amend the federal labor laws to permit unions to serve only those who pay their dues, I assume that it could do so. But that is not the legal regime we have today.
For all these reasons, I respectfully dissent.